CARL A. CAPASSO, Respondent, v NANCY CAPASSO, Appellant.

First Department, July 2, 1987

270

## APPEARANCES OF COUNSEL

*Myrna Felder* of counsel *(Raoul Lionel Felder, P. C.,* attorney), for appellant.

*Samuel G. Fredman* of counsel *(Alton L. Abramowitz* with him on the brief; *Fink, Weinberger, Fredman, Berman & Lowell, P. C.,* attorneys), for respondent.

## OPINION OF THE COURT

WALLACH, J.

In a prior decision on this appeal *(Capasso v Capasso,* 119 AD2d 268), we ruled that requests for findings of fact submitted pursuant to CPLR 4213 (a) cannot constitute the decision of the court mandated by Domestic Relations Law § 236 (B) (5) (g), and remanded for a decision. In addition, we directed the trial court, on remand, to give "some recompense" to the wife on account of her direct and indirect contributions to the husband's business career, to make an additional, specific finding of fact as to the total value of the marital property, and to make additional, unspecified findings of fact as would show how the values assigned particular assets were ascertained. Finally, we made our own finding of fact as to the

value of certain properties located in Long Island City. The trial court having rendered a decision, the matter is before us again together with "supplemental" briefs. We note that no requests for findings of fact pursuant to CPLR 4213 (a) were made by the parties on remand.

■ In its decision on remand, the trial court did not apply the value we assigned to the Long Island City properties, did not compensate the wife for her contributions to the husband's business career, and did not make any additional findings explanatory of its valuation of particular assets. With the case in this posture, we would be inclined to remand again, perhaps to a different Judge, were it not that both sides argue that the record is adequate to make all essential findings of fact and, emphasizing the protractedness of the proceedings already, importune us to make a final disposition of the matter and not to remand again. Responding to the parties' entreaties, we have made every effort to fashion a distribution on the basis of a voluminous record which, while adequate to reach a roughly fair result, makes review of the facts arduous if not futile. Much of the case does, as the husband argues, turn on credibility, the blind spot of an appellate court; proper requests for findings of fact submitted pursuant to CPLR 4213 (a) might have sharpened the reviewable issues and shed considerable light upon the weight of the evidence. Doubtless some of the problems encountered in reviewing the record, at least those relating to valuation, are due to the circumstance that the action was tried prior to the enactment of Domestic Relations Law § 236 (B) (4) (b) (L 1986, ch 884, § 2, eff Sept. 1, 1986) mandating an early ruling by the court on the date or dates to be used for the valuation of each asset.

Most factual issues were resolved by the trial court in favor of the husband on the ground that he and his witnesses were more credible than the wife and her witnesses. While we are prepared to defer to the trial court's findings of fact with respect to issues that turn on credibility, we do not accept, as the husband appears to suggest, that issues of credibility so pervade the record as to virtually preclude appellate review. We do not agree, for example, that valuation issues necessarily turn on such factors as the credentials and demeanor of the witnesses offering valuation testimony, and are thus effectively beyond the review of an appellate court (see, Capasso v Capasso, 119 AD2d 268, 273, supra; County of Warren v State of New York, 29 AD2d 717; Lord v State of New York, 48

NY2d 711; *but see, Wilbur v Wilbur,* 116 AD2d 953, 953-954; *see also, Cohen v Hallmark Cards,* 45 NY2d 493, 498; Cohen and Karger, Powers of the New York Court of Appeals § 112).

The trial court found total marital property of $4,254,492 out of which it awarded the wife $2,231,172. It might be supposed that the wife would not be dissatisfied with an award of more than half of the marital property, but her quarrel, of course, is not with her share of the distribution as such, but with the trial court's treatment of certain properties as separate and its low valuation of other properties treated as marital. According to the wife, the total value of the marital property is almost $19 million.

It would seem, therefore, at first blush, that valuation questions permeate the controversy. Actually, however, of the almost $19 million in marital property claimed by the wife, approximately $16 million, as valued by her, is made up of only four properties: the marital residence, a cooperative apartment located at 990 Fifth Avenue ($6 million); the business properties located in Long Island City ($4.6 million); the appreciation in the value of the husband's business, Nanco Contracting Corp. ($3.5 million); and the house and property located at 37 Exchange Place, Westhampton Beach, New York ($1.9 million). As to these, genuine valuation issues of a factual nature remain only with respect to Nanco and 37 Exchange Place, the dispute concerning the Long Island City properties having been resolved in our prior decision, and the dispute concerning the marital residence raising a question only of the time, not the amount, of valuation. Of the remaining $3 million of marital property seen by the wife, approximately $1.8, as valued by her, is made up of three properties, all in Quogue, New York, located at Beach Lane South of Dune Road and Beach Lane North of Dune Road ($1 million), and 80 Dune Road ($800,000). As to these, we find it unnecessary to assign values. The remaining assets, amounting to $1.2 million as valued by the wife, do not for the most part raise valuation issues.

Our distribution is made largely on the following premises: that the trial court was correct in viewing the age and health of the parties, and their need to occupy the marital residence, as of negligible significance; that Nanco was the only asset of any significant value brought into the marriage by either spouse; that the wife's standard of living was at all times during this 12-year marriage dependent on Nanco's success; that the wife became gainfully employed outside the home

approximately two years prior to the commencement of the action and has a good earning potential; that except for Nanco and other business-related properties, the equities warrant an equal distribution; that it is economically desirable that the husband retain his business assets intact and free from any claim or interference by the wife; that the wife would not be disappointed to gain, and the husband would not be disappointed to lose, properties which she considers to be of high value and he low; and that because he accumulated much debt between the commencement of the action and the trial, the husband is in more need of cash than the wife.

We see total marital property of $15.63 million, not including the Quogue properties, and four categories of assets. The first category is the parties' personal residences. These are 990 Fifth Avenue ($6 million), the house and property at 37 Exchange Place, Westhampton Beach ($1.9 million), the condominium apartment at 539 Dune Road, Westhampton ($200,000), and the condominium apartment and cabana in Palm Beach, Florida ($250,000), totaling $8.35 million. We award the parties equal shares in these properties, and, except for the Palm Beach condominium and cabana, value them as of the trial, June 1985. The second category of marital property is business assets. These are the appreciation in Nanco's value over the course of the marriage ($2 million), the properties located on Review and Railroad Avenues in Long Island City ($4,562,119), and the Hope Resources mortgage ($45,000), totaling $6.61 million. We value these as of January 1983, the commencement of the action, and award the wife a 20% share. The third category is real estate acquired for investment purposes, namely, the Quogue properties and the Schaeffer mortgage. These we do not assign monetary values, although we do find that 80 Dune Road is equivalent in value to the Beach Lane properties and the Schaeffer mortgage, and we distribute the former to the wife and the latter to the husband. The final category, miscellaneous items, consists of the household effects of 990 Fifth Avenue ($273,842), the Cy Twombly painting ($200,000), jewelry ($144,650), and the proceeds of the sale of the Dubuffet painting ($56,000), totaling $670,000. As to these, there is no dispute as to the values that should be assigned for purposes of the distribution, and we award the parties equal shares.

The total value of the residences ($8.35 million) and miscellaneous items ($470,000 after subtracting the value of the Twombly painting for reasons to be discussed) amounts to

$8.82 million; dividing by two, each party is credited with $4.41 million. The total value of the business assets is $6.61 million; awarding the wife 20% thereof, her share is $1.32 million. Thus, the wife's total share of the marital property, not including the Quogue properties and the Twombly painting, is $5.73 million. Against this, we credit the husband with $202,500 representing the wife's share of a personal bank loan outstanding in the amount of $405,000 as of the commencement of the action.

In satisfaction of this $5.53 million award to the wife, we distribute to her 37 Exchange Place ($1.9 million), 539 Dune Road ($200,000), the household effects of 990 Fifth Avenue as awarded by the trial court ($228,552), all of the jewelry ($144,650), and all of the proceeds of the sale of the Dubuffet painting ($56,000), totaling $2.53 million. The remaining $3 million is to be paid out of the proceeds to be realized on the sale of 990 Fifth Avenue. The costs of that sale, and the taxes to be incurred thereon, are to be shared equally by the parties. In addition, we award the wife 80 Dune Road, and half of the net proceeds to be realized on the sale of the Twombly painting.

Equities favoring the husband arising out of his court-ordered financial contribution towards the wife's exclusive occupancy of 990 Fifth Avenue since the commencement of the action are adequately adjusted for by denying the wife a share in the amount by which that property appreciated since the trial, and by giving the husband control over its sale. We are aware that it might be necessary or desirable for the wife to sell some of the properties we are distributing to her, in which event she would be solely responsible for the taxes to be incurred thereon, but, against this, the same can be said of the husband with respect to the properties being distributed to him. We also take into consideration that while the husband has been paying down the mortgages on the properties being distributed to the wife and otherwise maintaining them during the pendency of the action, he is being denied a share in their posttrial appreciation. With these considerations in mind, we make no adjustments on account of the tax consequences of our distribution, which is not to suggest that a convincing showing has been made as to what those consequences might be.

Our evaluation of the various items of marital property follows:

## PERSONAL RESIDENCES

*990 Fifth Avenue:* The most valuable asset of the marriage is the marital residence, a cooperative apartment located at 990 Fifth Avenue across the street from the Metropolitan Museum of Art. Purchased in April 1980 for $764,897 in the parties' joint names, the apartment was free of liens as of the commencement of the action if not well before. The parties undertook extensive renovations, which still were not finished when they moved into the apartment during the winter of 1981. Approximately $1.5 million to $2 million was spent on these renovations, to good effect. Featured in the April 1983 issue of Architectural Digest, it is undisputed that the apartment was worth $3 million as of the commencement of the action in January 1983, the valuation date selected by the trial court, and $6 million by the time of trial in the summer of 1985, the valuation date urged by the wife. More than likely, the renovations, as much as market forces, account for this remarkable appreciation, making the apartment what the appraisers call a "specialty". In issue is whether 990 Fifth Avenue should have been valued as of the time of trial.

The husband, as is the case with virtually every item of marital property, provided the funds for the acquisition of the apartment and its renovation, using business associates and contacts in the construction industry to do the renovations. The wife, however, also took an active interest, and was the spouse on the premises who actually dealt with the architects and decorators. The husband provided the funds, but the wife was in charge of the work.

The husband emphasizes that 990 Fifth Avenue was purchased in part with the proceeds of the parties' prior marital residence in Old Westbury, Long Island, that the Old Westbury residence was purchased in part with the $80,000 proceeds of the 1973 sale of the parties' first marital residence in Greenvale, Long Island, and that the Greenvale residence was purchased (for $51,000) by the husband with his own funds in January 1971, two months before the marriage. The wife, for her part, testified that she contributed as much as $55,000, obtained from the sale of her premarital home and the liquidation of a stock account, towards the purchase of the Greenvale house and sundry household expenses incurred in starting up the family, but her testimony was discredited by the trial court. We affirm the trial court's finding that no such financial contribution was made by the wife, the trial court

having had before it an issue of credibility. Nevertheless, given the magnitude of the distribution and, more particularly, the opulence of 990 Fifth Avenue, we consider it to be a low-order equity that the husband brought a modest residence into the marriage, and, for purposes of the distribution, we give this fact no monetary weight.

What we consider most important about 990 Fifth Avenue is that it is the pride and joy of both parties, the crowning achievement of their marital career together. Given the emotional attachment of both to this asset, as well as the financial stakes involved, we think it would be unfair to distribute it to either. As is not infrequently the case, the fairest thing to do with the marital residence, absent custodial or other compelling considerations, is to value it as of the time of trial (see, Wegman v Wegman, 123 AD2d 220, 232), give each spouse a 50% interest, and sell it (see, Rubin v Rubin, 105 AD2d 736, 740; Cohen v Cohen, 104 AD2d 841, 844; Adkins v Adkins, 104 AD2d 431), with the costs and taxes incurred on the sale shared equally by the parties and the net proceeds used to fund any distributive awards necessitated by the equities of the case.

One such equity here is a pendente lite order awarding exclusive occupancy of 990 Fifth Avenue to the wife, and directing the husband to pay, in addition to maintenance of $78,000 a year and child support of $18,200 a year, the carrying charges on 990 Fifth Avenue of approximately $75,000 a year (see, Capasso v Capasso, 99 AD2d 938) at a time when the wife was earning as much as $100,000 a year as a real estate broker. It was on account of this obligation to financially maintain the wife's exclusive occupancy of 990 Fifth Avenue that the trial court denied her a share in the $3 million appreciation of that property realized between the commencement of the action and the trial. This was accomplished by giving the wife a distributive award of half the value of 990 Fifth Avenue, with value measured as of the commencement of the action. While we agree that the husband's financial maintenance of the wife's exclusive occupancy is an equity that weighs in his favor, we do not agree that it weighs so heavily as to warrant denying the wife a share in the appreciation. We indicated as much in our own temporary order issued shortly after the appeal was taken. The trial court's judgment having directed the wife to vacate 990 Fifth Avenue by March 18, 1986, we reinstated her exclusive occupancy pending the appeal, but required the husband to pay

only half of the carrying charges, and then only with the proviso that, in the event we affirmed the trial court's ruling that the wife should vacate, the husband would have "the right to seek recoupment" of any such payments made after March 18, 1986 out of any distributive award given to the wife. A dollar-for-dollar refund was what was contemplated.

Now that the time has come to make the adjustment indicated in our temporary order, the wife reminds us that the husband's payments of the carrying charges were taxable to her and deductible by him, and that a straight dollar offset would not reflect economic realities. It should also be remembered that the award of exclusive occupancy to the wife was a decision made partly in consideration of the best interests of the children, and, to that extent, benefited the husband as well. We are satisfied that the equities can be fairly adjusted by denying the wife a share in the appreciation of 990 Fifth Avenue realized since the trial, and by giving the husband control over its sale. That there has been some posttrial appreciation in the value of 990 Fifth Avenue is, for purposes of adjusting these equities, sufficiently indicated by the wife's representation to us, made in connection with a motion she made in December 1986 for permission to sell 990 Fifth Avenue, that she had found a purchaser ready to pay $6.5 million for it. The husband opposed that motion partly because he thought the possibilities were good that he could find a purchaser ready to pay more.

The wife is directed to vacate 990 Fifth Avenue by December 31, 1987; the husband is directed to consummate a sale thereof by June 30, 1988. So much of our interim order of February 27, 1986 as directed the husband to pay half of the carrying charges is continued until October 31, 1987. Between November 1, 1987 and December 31, 1987, the wife shall pay all of the carrying charges for as long as she remains in occupancy. Between January 1, 1988 and June 30, 1988, the husband shall pay all of the carrying charges.

*37 Exchange Place:* Purchased in or about May 1981 for $870,000 in the husband's individual name, this bayfront property of three acres is located in a very fashionable area of Westhampton Beach and improved with a wood frame house, in-ground swimming pool, tennis court, boat house, dock facilities, and cottage of wood frame construction that can be used as a guest house. The photographs in evidence appear to corroborate the wife's description of this property as a sumptuous estate. It is, as the appraisers say, an "over-improve-

ment" in that the majority of the homes in the neighborhood are small in comparison. It is also very marketable, and appreciated substantially in value between the time of its purchase and the trial, as indicated by the fact that property values in the Town of Southampton, where it is located, increased on average by 25% between 1982 and 1984. The house is amply furnished, but no proof of the value of the furnishings was offered at the trial.

The wife played a major role in the acquisition of 37 Exchange Place, learning about it in the spring of 1981 through her business connections as a real estate broker at Sotheby Parke Bernet International Real Estate, using those connections to secure a contract for its purchase, and encouraging the husband to take an interest in and buy it. The parties took possession on August 3, 1981, did some remodelling, and used the property as a weekend residence until the fall of 1982, just prior to the commencement of the action.

On January 3, 1983, the day of the commencement of the action, the husband transferred approximately one acre of 37 Exchange Place, unimproved except for the tennis court, to Nanco for $225,000 in partial extinguishment of a "loan account" his accountant recommended be kept with Nanco as something like a running account of Nanco funds used for personal reasons. Whatever the bookkeeping or auditing purpose of this loan account, for purposes of the distribution we view Nanco as the husband's alter ego for reasons which we have previously commented on (Capasso v Capasso, 102 AD2d 796), and disregard this transfer of a portion of 37 Exchange Place to Nanco.

The husband's expert submitted two separate appraisals, one for the parcel in the husband's name and the other for that in Nanco's name. The fair market value of the husband's parcel was appraised at $490,000 as of January 1983, and $700,000 as of June 1985; Nanco's at $200,000 as of January 1983, and $300,000 as of June 1985. The expert further testified that the husband paid more than fair market value for 37 Exchange Place in purchasing it for $870,000. Claiming that the wife is not entitled to a share of Nanco's parcel and that the parcel in his name should be valued as of January 1983, the husband subtracted a mortgage outstanding in the amount of approximately $640,000 as of January 1983, and successfully argued that the property should be assigned no value for purposes of the distribution. The wife's expert, much less persuasive than the husband's, appraised the fair market

value of 37 Exchange Place at $1.9 million as of June 1985, and admitted that it was probably worth somewhat less in January 1983. As is the case with all of the real properties the wife seeks a share of, her argument assumes that 37 Exchange Place was free of encumbrances as of June 1985; either that, or she is of the opinion that outstanding mortgages are not a relevant factor in valuing real property for purposes of this distribution. In this regard, we note her proposal to the trial court, not reiterated on appeal, that absent agreement between the parties on a distribution, everything should be sold, with the parties sharing equally in the net proceeds.

■ We award 37 Exchange Place to the wife, assigning it the $1.9 million value urged by her on the theory that, once having decided to distribute it to her in kind, an inflated valuation would, by diminishing the amount of the distributive award in the proceeds of the sale of 990 Fifth Avenue, work to her disadvantage under our plan of distribution.

*539 Dune Road; Palm Beach condominium and cabana:* Two condominium apartments were purchased in the parties' joint names and used by them as vacation homes, one located at 539 Dune Road, Westhampton, New York, purchased in or about 1975, and the other located at 100 Sunrise Avenue, Palm Beach, Florida, purchased in 1978. A cabana purchased in 1978 is regarded by the parties as something of an appurtenance to the Palm Beach condominium.

The parties are in agreement that the Dune Road property, the only real estate distributed to the wife by the trial court, should be valued at $200,000 for purposes of the distribution. As for the Palm Beach condominium and cabana, the husband put their fair market value at $400,000 as of the commencement of the action, and, subtracting an outstanding mortgage of $150,000, assigned them a net value of $250,000; the wife valued them at $575,000 as of the trial. Since the wife offered no proof of value as of the commencement of the action, which is when the Palm Beach property should be valued, we accept the $250,000 valuation urged by the husband and found by the trial court. That valuation, we note, is consistent with an affidavit dated May 17, 1983, submitted by the husband in opposition to a temporary maintenance motion by the wife, wherein he stated that the Florida condominium and cabana together had a "Purchase Price/or Value" of $240,000 and were subject to a mortgage of $145,000. It is also consistent with the husband's net worth statement, dated September 28,

1983 and valuing his assets as of August 31, 1983, wherein he stated that the condominium and cabana were purchased for $240,000, were subject to a mortgage of $144,150, and that he did not know their present fair market value.

We award the Dune Road property to the wife and the Palm Beach property to the husband, since at least one residence should be awarded to the husband, and it might as well be Palm Beach inasmuch as Nanco owns a second apartment in the same condominium that was normally used for business purposes. That the trial court saw fit to distribute Palm Beach to the husband and Dune Road to the wife also is a weighty consideration.

### BUSINESS ASSETS

*Nanco appreciation:* In our prior decision, we found as a fact that the wife contributed both directly and indirectly to the husband's business career, and accordingly directed the trial court, on remand, to give her efforts "some measure of recognition in determining, among other things, the equities relative to the appreciation in the value of the husband's business, separate property though it might be" (119 AD2d 268, 274-275, *supra,* citing *Price v Price,* 113 AD2d 299). While the rationale of our prior decision might not have been articulated exactly in accordance with the reasoning of the Court of Appeals subsequent affirmance of *Price v Price* (69 NY2d 8), the result is readily reconcilable therewith. In effect, we found that Nanco's appreciation during the marriage was due in part to the wife's contributions and efforts within the meaning of Domestic Relations Law § 236 (B) (1) (d) (3), and remanded to the trial court for a consideration of such appreciation as an item of marital property for purposes of section 236 (B) (5) (d) (6). Yet, the trial court, disregarding our direction, again fashioned a distribution that treated the wife's contributions as worthless, expressing the view that such services as she might have provided directly to Nanco were insignificant and "most casual", and that, insofar as her claim was based on indirect spousal, parental and homemaker services, she "could not correlate how and in what manner [such services] led to the appreciation". In support of this position, the trial court cited *Jolis v Jolis* (98 AD2d 692, *affg* 111 Misc 2d 965) which, at the time of its original decision in December 1985, was the leading authority in this Department construing the exception to separate property set out in section 236 (B) (1) (d) (3) for

appreciation "due in part to the contributions or efforts" of the nontitled spouse. Therein, we affirmed the trial court's construction of the words "contributions or efforts" as excluding services as a spouse, parent, wage earner and homemaker, or to the career or career potential of the other spouse, but, in doing so, we were careful not to "foreclose the possibility" that such services could in other cases be found to contribute to the appreciation of the other spouse's separate property.

The circumstances in *Jolis* were indeed unusual and compelling in that most of the appreciation in the business involved in that case was realized after the parties had separated, and such appreciation as was realized before the separation was due in large part to market factors beyond the parties' control and to the contributions and efforts of the husband's business associates *(Jolis v Jolis,* 111 Misc 2d, *supra,* at 967, 980). Given these circumstances, it is not altogether clear that a correct reading of section 236 (B) (1) (d) (3) would have significantly altered the distribution that was made in *Jolis.* Be that as it may, the trial court should not have continued to rely on *Jolis* in its decision on remand, which was rendered after *Price v Price (supra)* came down, and with awareness of a subsequent Court of Appeals case definitively construing section 236 (B) (1) (d) (3).

" '[A] wide range of nonremunerated services * * * such as homemaking, raising children and providing the emotional and moral support necessary to sustain the other spouse in coping with the vicissitudes of life outside the home' " *(Price v Price, supra,* at 14, quoting *Brennan v Brennan,* 103 AD2d 48, 52) must be taken into account not because they have a measurable value in dollars and cents, but because, marriage being a " 'joint enterprise' " *(Price v Price, supra,* at 14), they are presumed to give the titled spouse the time to devote to financial endeavors *(supra,* at 18). "Whether assistance of a nontitled spouse, when indirect, can be said to have contributed 'in part' to the appreciation of an asset depends primarily upon the nature of the asset and whether its appreciation was due in some measure to the time and efforts of the titled spouse" *(supra,* at 17-18). Here, the husband is the sole shareholder of a so-called "key man" corporation that required his full time and energies throughout the marriage. Without him, there would have been no Nanco.

In evaluating the wife's contributions to the husband's business pursuits for purposes of Domestic Relations Law § 236 (B) (5) (d) (6), the first fact that comes through is that

their relationship preceded his success. They met in 1965; he a young man of 20 working for his father in the latter's own construction business; she, five years older, a graduate of Skidmore College, married and a mother. By 1967, the husband had left his father to operate machinery for other contractors, and, in 1968, he formed Nanco Contracting Corp., apparently naming it after the wife, whose first name is Nancy, and running it out of his residence at the time, a hotel room in Forest Hills. It is not clear exactly when the parties began residing together in that hotel room, if they ever did, but the wife spent much time there doing Nanco's payroll records, picking up bids, making and taking deliveries, answering the telephone, meeting with the accountant, and learning about the construction business. By the time the parties were married in March 1971, Nanco was a going concern with a value, according to the husband, of $1 million. This figure is disputed by the wife, who contends that the record contains no competent proof of Nanco's value as of the marriage, but such lack of proof does not mean it should be assumed that Nanco had no value at that time. While we agree that the husband's $1 million figure is supported by little more than his say-so, we cannot say that it is against the weight of the evidence, which includes testimony that his father had made a gift to him of machinery that was used in starting up Nanco. In any event, the burden was on the wife to prove the extent of Nanco's appreciation during the marriage (see, Davis v Davis, 128 AD2d 470; Bidwell v Bidwell, 122 AD2d 364, 366-367; Hirschfeld v Hirschfeld, 96 AD2d 473, appeal dismissed 60 NY2d 701), which necessarily required her to prove its value as of the commencement of the marriage. This she did not do.

It is true that construction was the husband's, not the wife's, line of work, a line which his family had been involved in for three generations, but the wife immersed herself in it, dedicating herself to and identifying with the husband's success, and, by just being present and making herself available to help in any way she could, she contributed directly and significantly to Nanco's success. This had to be so, especially during Nanco's formative period spanning several years before and after the marriage, when it was being run out of the parties' residences—first the hotel room in Forest Hills, then the house in Greenvale, and finally the house in Old Westbury. During this period the wife did paper work and legwork for Nanco, routinely discussed business matters with the

husband, and was familiar enough with Nanco's finances to consult with its accountant. These services were such that, if they did not have a measurable monetary value, they certainly freed the husband to spend his time at construction sites. During these early years there was really only the two of them. As the business grew and began to flourish in the mid-1970's, the wife's direct involvement diminished considerably, but we do not consider it completely without significance that she continued to be an officer of Nanco, to concern herself with some of its record keeping, to consult with its managers other than the husband, to coguarantee its obligations, and to entertain its customers, associates, and, as she puts it, "political people", until the very end.

Two children were born of the parties in 1972 and 1974, and with three children of the wife from her prior marriage, ages 6, 9 and 11 when the parties got married, they all lived together in the same residence as a family of seven. The wife's three children were financially and in all other respects treated exactly like the parties' own two children, which treatment included luxuries and extras, such as cars and college educations. The family employed two full-time housekeepers for most of the marriage, which tends to explain why the wife's argument gives much less attention to her homemaker services than to her "direct" services to Nanco, but it is clear that she spent more time with the children than the husband and was the spouse primarily responsible for running the household.

Thus, while we fully agree with the trial court that the financial and parental support given the wife's three children by the husband is an equity that weighs heavily in his favor, the wife's homemaker services should not have been completely discounted. No contention is made that she was indolent in this respect, or did not attend to her fair share, perhaps more, of the family's domestic responsibilities. Even the husband's requests for findings went only so far as to say that the wife's services as a spouse, parent, wage earner and homemaker were not "extraordinary", "unusual", or "significant". Considering the wife's direct contributions to Nanco in combination with her spousal, parental and homemaker services, we find her equitable share in Nanco's appreciation to be 20%.

That appreciation we find to be $2 million. The wife's expert, very well qualified as an appraiser of small corporations, valued Nanco as of the commencement of the action at

$3.5 million. We give his testimony little weight, however, as it was not supported by a written appraisal, and indeed, he did not purport to explain how he arrived at this figure except to say that it was based on an examination of Nanco's certified financial statements. These statements, at least dating back to 1979, were prepared by Nanco's accountant who, testifying on behalf of the husband, suggested that certified financial statements prepared for business purposes were not necessarily accurate indicators of value for other purposes, and, using a net asset method of valuation, he fixed Nanco's value at $2.1 million as of June 1982. On appeal, the wife challenges this appraisal for not including the value of contracts in progress and contract retainages totaling $1.3 million, but absent expert testimony as to the significance of these items, or even an indication that they were included in the wife's own expert's appraisal, we cannot say that their omission discredits the husband's appraisal. We can say, however, that in the absence of further proof bearing upon the nature of Nanco's business and its history as an enterprise, and further explanation of the net asset method of valuation, it is incredible that Nanco was worth only $2.1 million in 1983 when it was worth as much as $1 million in 1971. It is against the weight of the evidence relating, for example, to the nature of Nanco's jobs, quite small in the beginning and large at the end, and to the parties' standard of living, quite modest in the beginning and lavish at the end, indicating growth by Nanco throughout the period of the marriage that was constant and substantial, and that peaked at about the time of the commencement of the action. Including the second Palm Beach apartment in Nanco's name, valued by the wife at $375,000, we think Nanco's net asset value as of the commencement of the action lies between the values urged, namely $3 million. This conclusion accords with a statement given by the husband to a bank in December 1982 for purposes of a loan application, wherein he represented that Nanco's value as of September 1982 was $3 million. It also takes into account the fact that the husband's expert valued Nanco as of six months prior to the commencement of the action. Finally, it reflects that, given the surprisingly low valuations of Nanco offered by both sides, the dispute over its value is something of a tempest in a teapot warranting only so much review in the absence of clear evidence, which the husband's appraisal is not. The valuation we assign to Nanco includes the Palm Beach condominium in its name, but not the Twombly painting.

*Long Island City properties:* These properties were acquired in the husband's name in April 1979 and April 1980 for $975,000 in the aggregate, and used by him as Nanco's headquarters with Nanco paying rent to him of approximately $600,000 a year. Aside from 990 Fifth Avenue, they are the most valuable asset of the marriage, and were the subject of the wife's first and most vigorously argued point. In our prior decision, we reversed the trial court's valuation of $268,000 as of the commencement of the action, and found their value to be $4,462,119 as of that time. On remand, however, the trial court adhered to its original valuation, which it again set forth in conclusory fashion. Except for the husband's pure ipse dixit, the basis for this finding is not apparent in the record. On this issue, the weight of the evidence is clearly with the wife.

*Hope Resources mortgage:* One acre of the Long Island City properties was sold by the husband, and a mortgage, unpaid in the amount of $248,550 as of the commencement of the action, taken back from an entity known as Hope Resources. This amount should have been included in the sum of marital property, there being no other proof of the present value of this mortgage as of the commencement of the action.

### INVESTMENT PROPERTIES

Three properties in Quogue, New York, known as Beach Lane South of Dune Road, Beach Lane North of Dune Road, and 80 Dune Road were acquired in 1982 in the husband's name for speculation, as by this time in his career he thought of himself as not only a "construction executive" but also a "real estate investor". The trial court's finding that the wife made no direct contributions to the acquisition of these properties is not against the weight of the evidence, notwithstanding that, when it comes to real estate, the wife is the one with professional status. In addition to these properties, all acquired in 1982, another property, also in Quogue, known as 345 Dune Road, was purchased in 1978 in the parties' joint names as an investment, and sold to people named Schaeffer. Upon its sale, a mortgage was taken back in the husband's name that remained unpaid in the amount of $93,750 as of January 1983, which mortgage should have been considered as marital property.

Beach Lane South of Dune Road was acquired in April 1982 and is unquestionably marital property. However, because the

closings on Beach Lane North of Dune Road and 80 Dune Road did not take place until January 5, 1983, two days after the commencement of the action, they were found by the trial court to be the husband's separate property although negotiations were completed and contracts signed several months earlier. We disagree with this ruling as not in accord with the intent of the statute to expand the extent of marital property and diminish that of separate property *(Price v Price,* 69 NY2d 8, 14-17, *supra),* and we accordingly hold that Beach Lane North of Dune Road and 80 Dune Road are marital property.

The equities bearing upon the Quogue properties are complex. On the one hand, because acquired by the husband as an investment late in the marriage without direct contribution by the wife, and maintained solely by him thereafter by dint of court orders restraining their disposition, there is appeal to the argument that his investment skill should be rewarded by valuing the properties as of the commencement of the action and distributing them to him in kind. On the other hand, real estate on eastern Long Island being a subject that was introduced to the husband by the wife, it would not be fair to deprive her of a share in what she claims was a bonanza. We agree that the wife should be given a share, and hold that it should approximate 50%. To the extent the husband might think this too generous to the wife, the wife might think our award to her of only 20% in the business properties too grudging.

Proof of value was never joined, the husband valuing only as of the commencement of the action and the wife only as of the trial. Nevertheless, we are satisfied that the 80 Dune Road property, which is improved, has always been approximately equivalent in value to the two Beach Lane properties, which are unimproved, and that fairness can be achieved by distributing the former to the wife and the latter to the husband. Beach Lane South of Dune Road was purchased for $346,000; according to the husband, it had a fair market value of $348,000 and an outstanding mortgage of $325,000 in January 1983, for a net value of $23,000 as of the commencement of the action, which was the value assigned to it by the trial court. 80 Dune Road was purchased for $475,000; according to the husband, this was also its fair market value in January 1983, but because of an outstanding mortgage in that amount at that time, he argues that the property had no net value as of the commencement of the action. Beach Lane North of Dune Road was purchased for $190,000; according to the

husband, it was subject to an outstanding mortgage of $130,000 in January 1983, and thus had a net value of $60,000 as of the commencement of the action. Whether such "net values" are an appropriate measure of value for these properties is not a subject of argument, but, at the least, their purchase prices do seem to be plausible indicators of fair market value as of the commencement of the action, which came so soon after their acquisition. On the question of relative value, we note that 80 Dune Road, acquired only a few months after Beach Lane South of Dune Road, was purchased for only $61,000 less than the two Beach Lane properties together.

The wife, for her part purporting to testify as an expert on the basis of her familiarity with property values in the Westhampton area and background as a real estate broker, gave the Beach Lane properties an aggregate value of $1 million, and 80 Dune Road a value of $800,000. Her opinions were conclusory, however, and those of her expert, a local real estate broker, were discredited by the trial court for, among other reasons, bias due to a business relationship with the wife's employer. Even so, the wife's figures were the only proof of value as of the trial.

Shortly after the appeal was filed we stayed the husband from selling the Quogue properties. After our prior decision, while the case was on remand, the parties entered into a stipulation permitting the husband to sell the Quogue properties upon certain conditions, including that a portion of the sales proceeds be used to make good on maintenance arrears and to fund an escrow account securing the payment of future maintenance. The husband thereupon sold the Beach Lane properties.

The proceeds of the sale of the Beach Lane properties being in the hands of the husband, we treat those properties as having been distributed to him, and distribute 80 Dune Road to the wife. The Schaffer mortgage is distributed to the husband.

### MISCELLANEOUS PROPERTIES

*Household effects of 990 Fifth Avenue:* The household effects of 990 Fifth Avenue have an undisputed value of $273,842. At the conclusion of the trial, the court requested the parties to submit proposals as to how these should be distributed. Arguing that it was in the best interests of the children that they continue to reside with her in 990 Fifth Avenue, the wife

proposed that the household effects be awarded to her intact. This was rejected by the trial court, which instead adopted the husband's proposals as to each and every item. The wife argues that such decision making "swept away into the husband's column the most cherished and important articles", even though she ended up with articles having an aggregate appraised value of $228,522 and the husband with only $45,320. Her argument is that were we to look at the written appraisal offered by the husband and relied upon by the trial court, we would find that she "gets the used appliances, the kitchen stove, the built-ins, and a host of other items which do not have the kind of value of those items selected by [the husband]." We have done what the wife asks, given the written appraisal in question a close, albeit unguided, inspection, and find that the distribution made by the trial court was not unfair.

■ *Jewelry:* The dispute concerning the jewelry is not over value but possession, the wife asserting that the husband has almost all of it amounting in value to $144,650. Especially disturbing to her is his alleged retention of a ring she owned prior to the marriage. Very early on in the action, the wife made a motion seeking to compel the husband to return the jewelry, which motion resulted in an order directing the husband to either return the jewelry or furnish a sworn statement explaining why he could not. Returning no jewelry, the husband's sworn statement was to the effect that he had none of the jewelry in his possession nor knowledge of its whereabouts. It does not appear that this order was ever appealed; nor are the motion papers underlying it included in the appendices. Although neither side offered proof at trial bearing upon who last had possession of the jewelry, the parties submitted the question to the trial court, which awarded the jewelry to the wife without making a finding as to whether it was she or the husband who last had possession. Upon the basis of the record before us, we are unable to supply such a finding. As noted, the record underlying the wife's original motion to compel the husband's return of the jewelry is not before us, and even if it were, the issue would more than likely turn on credibility. Our decision to charge the value of the jewelry to the wife is not meant to foreclose her from seeking an adjudication on the question of possession and an appropriate remedy.

■ *The Dubuffet painting:* In or about May 1985, the wife sold this painting for $70,000, which was less than what the

parties had paid for it in 1978. After a broker's commission of 20%, the net proceeds realized were $56,000, which the wife deposited in a trust account for the parties' children. In explanation, the wife testified that in May 1985 she had good reason to anticipate that the husband, contrary to a court order requiring him to do so, was not going to pay the expense of sending the children to camp that summer, and that she did not have the money herself. Her trepidations were justified in view of an affidavit submitted by the husband in April 1985 in opposition to a motion she made to compel such payment. And, despite the fact that the husband stated in that affidavit that he was "absolutely financially incapable of paying for my children's camp at this time", he was then making large cash payments to renovate his new, postmarital residence and spending other considerable sums on himself. The husband argues that the sale of such artwork to cover an expense amounting to only $10,000 was a dissipation of a valuable asset, but we credit the wife's testimony that she also had reason to fear that the husband was not going to pay the children's private school tuition the following fall, and that she had been advised by reputable art dealers that $70,000 was a good price for the painting. Accordingly, we find that the wife's sale of the Dubuffet painting was not imprudent. As the husband has made good on all of his maintenance obligations, and taking into account as a countervailing factor the trial court's finding that the wife, while subject to a temporary order directing shared occupancy of 539 Dune Road on an alternate monthly basis, rendered it useless to the husband as a residence by stripping it of its furniture and contents each time she moved out, we give the parties equal shares in the Dubuffet painting, and distribute the proceeds to the wife.

■ *The Cy Twombly painting:* This is perhaps the single most cherished item of personal property owned by the parties, and they have fought hard for control over it *(see, Capasso v Capasso,* 102 AD2d 796, *supra).* Purchased in November 1981 for $192,500 at an auction that the wife heard about and encouraged the husband to take an interest in, there is no dispute that its value should be put at $200,000 for purposes of the distribution. It is the husband's contention that the painting was purchased by Nanco for eventual display in its Long Island City offices then under renovation, and that the wife therefore has no equitable interest in it. While it is true that a Nanco check was used to purchase the painting, and that it was carried on Nanco's books as a corporate asset,

the bill from the seller indicated that the sale was made to "Nancy R. Capasso Interiors/Carl Capasso, 990 Fifth Avenue, New York, NY, 10021." Morever, the painting was delivered by the seller to 990 Fifth Avenue, has hung there ever since, and was discussed in the Architectural Digest article as integral to its decor. These circumstances, together with evidence throughout the record that Nanco checks were often used by the husband (as were Nanco credit cards by the wife) for personal reasons, lead us to conclude that the painting should not be deemed a business asset. The husband's claim, which we do not credit, that the painting was being stored at 990 Fifth Avenue to await completion of Nanco's renovation does not explain why the painting was sold to Nancy R. Capasso Interiors unless, as she asserts and he denies, she was helping out with Nanco's interior decorations. As we see no compelling equities favoring a distribution to either party, and for the reasons stated in connection with 990 Fifth Avenue, we direct that the painting be sold, with the costs of the sale and net proceeds to be shared equally by the parties.

█ *Liquid assets:* The trial court charged the wife with $130,000 for bank and stock accounts under her control as of the commencement of the action. We do not include this in the sum of marital property as the husband's net worth statement indicated that he was in control of liquid assets in a comparable amount as of the commencement of the action— cash ($500); checking ($4,250); savings ($27,300); and securities ($86,000).

### TAXES

The trial court ruled that the parties were to be equally responsible for "any taxes, interest, and penalties which may be assessed against either or both of the parties with respect to any joint income tax returns heretofore filed by the parties". This was done because of concern that certain tax shelters, used in the past but being challenged by the IRS at the time of trial, would be disallowed. Specifically, the husband's accountant testified that the parties faced a probable liability of more than $1 million because of tax shelter deductions taken in 1980 and 1981. The trial court reasoned that since the tax savings realized from these shelters inured to the parties' mutual and equal benefit, so too should any disallowances inure to their mutual and equal detriment.

The wife's argument on appeal did not so much take issue

with the concept of her sharing equally in this potential liability for tax shelter disallowances as with the phrasing of the trial court's judgment which had her sharing equally in the payment of "any" taxes, interest and penalties to be assessed, without limitation as to the reason for the assessment. She was particularly concerned with certain Nanco checks the proceeds of which, according to an accountant she called as an expert witness, may not have been received by the payees named thereon but by the husband. She then went on to argue that if upon an audit of the parties' tax returns the IRS were to take the position that the proceeds of such checks should have been reported as personal income, it would be unfair to require her to contribute towards such a liability since the husband had been solely responsible for preparing the parties' joint tax returns. The husband characterized these concerns as "preposterous", but, while the appeal was on remand, he pleaded guilty to a Federal indictment charging him with tax evasion for, among other things, causing Nanco to write checks to "fictitious claimants".

The indictment was submitted to us by the wife in support of a motion she made to strike the husband's supplemental reply brief because of references therein to financial reversals caused by the notoriety surrounding this criminal proceeding. Apparently offering the indictment to show that large sums of cash generated by the husband's tax evasion scheme were spent by him in renovating his lavish postmarital apartment as well as 990 Fifth Avenue, and that he has ample separate property to cushion the financial blow of a prison term, the wife, noting that the husband had pleaded guilty to the indictment, offered it as the "one piece of incontrovertible documentary evidence" that could properly be relied upon on the appeal even though not part of the record. As the husband does not take issue with the wife's submission of the indictment, and indeed relied upon it himself in his cross motion to strike the wife's supplemental reply brief, we deem it part of the record. We also note the husband's representation made in his supplemental reply brief that he has been sentenced to four years in prison and a $500,000 fine.

The indictment charged, inter alia, that during the fiscal year ending June 30, 1981 the husband and others conspired to assist Nanco in preparing a corporate tax return that was false in that it did not report moneys paid to or on the husband's behalf, but instead charged such moneys to Nanco's cost of goods sold and total deductions, and that this had the

effect of reducing Nanco's taxable income. Such moneys included $91,159 and $682,000, respectively, paid to a named architect and construction company for architectural fees and construction costs relating to the renovation and furnishing of 990 Fifth Avenue, and an additional $39,923 paid by Nanco to fictitious claimants "to generate cash". Another count of the indictment charged the husband with the same acts for the fiscal year ending June 30, 1982, with $240,268 and $20,000 paid, respectively, to the same architect and construction company for the renovation and furnishing of 990 Fifth Avenue, and an additional $194,050 to fictitious claimants to generate cash. A third count relating to fiscal year 1983 charged the same, with $6,128 and $6,475 paid, respectively, to the same architect and construction company for the renovation and furnishing of 990 Fifth Avenue, and an additional $124,350 to fictitious claimants to generate cash. A fourth count charged the same acts for the fiscal year ending June 30, 1985, except that the payments in this instance, amounting to $200,000, were made to the same construction company for the renovation of the husband's postmarital cooperative apartment at 563 Park Avenue. Two other counts charged the husband with understating the amount of tax due from Nanco by at least $95,387 for the fiscal year ending June 30, 1981, and $363,487 for the fiscal year ending June 30, 1982, because of a willful and knowing misapplication of the "net operating loss carryback" adjustment; finally, two more counts charged him with personal income tax evasion for underreporting his taxable income by $336,968 in calendar year 1981 and $373,290 in 1982, and understating his tax due by $232,022 in 1981 and $83,704 in 1982.

The indictment thus charged the husband with having paid a total of $1,046,030 toward the renovation of 990 Fifth Avenue, and an additional $358,323 to fictitious claimants to generate cash so as to enrich himself and his coconspirators, none of whom were named in the indictment. While we cannot say exactly how much of the cash generated by the checks made out to fictitious claimants was used to renovate 990 Fifth Avenue, we can say that the wife herself has represented that over $2 million was spent on the renovations *(see, Capasso v Capasso,* 102 AD2d 796, *supra),* and that she has never put the figure at less than $1.5 million. It is therefore reasonable to conclude that much, if not all, of the $358,323 generated by these bogus checks was used to pay for the renovation of 990 Fifth Avenue.

■ Viewing marriage as an economic partnership, we are in agreement with the proposition that spouses should share losses as well as profits, liabilities as well as assets incurred in the pursuit of marital wealth. Upon settling the accounts of the spouses, it should make no difference that wealth was acquired through unlawful means where, as here, the innocent spouse benefits therefrom. Since most, if not all, of the cash generated by the husband prior to the commencement of the action through his tax evasion scheme was apparently used to purchase and renovate 990 Fifth Avenue, and is thus reflected in the valuation assigned to that property, the wife should share in the financial liability arising out of the crime.

Of course, it hardly need be said that the wife should not have to share in the $500,000 fine to which the husband was sentenced. Nor should she have to share in any civil fraud or other penalties imposed by IRS on account of the acts charged in the indictment.

Accordingly, any taxes and interest that may be assessed against either or both of the parties with respect to any of their joint income tax returns shall be paid and borne equally by them if attributable to disallowed tax shelters or to the acts charged in the indictment. Payment of penalties is to be shared equally if attributable to disallowed tax shelters, and made by the husband alone if attributable to acts charged in the indictment.

### MOTIONS TO STRIKE BRIEFS

In connection with an argument that the wife should not share in 990 Fifth Avenue without also sharing in the tax liability for the concealment of income used to purchase and renovate it, the husband's supplemental reply brief stated: "This [wife] is no innocent spouse. She knew what was going on and when she was dissatisfied with the result obtained from the Trial Court herein, it was she who took this evidence to the government in order to obtain revenge against the [husband]." The record contains no support for this statement, and it is accordingly stricken. The wife's motion to strike the husband's supplemental reply brief is otherwise denied. The cross motion by the husband to strike the wife's supplemental briefs and appendix is denied.

Accordingly, the judgment of the Supreme Court, New York County (Andrew R. Tyler, J.), entered December 18, 1985, which, *inter alia,* ordered a distribution of marital property, is

modified, on the law and the facts, to provide that the parties share equally in the costs of providing the children with private school and college educations, summer camps, medical and dental care, and during their minority a policy or policies of insurance for hospitalization, surgical and major medical benefits; that defendant vacate 990 Fifth Avenue by December 31, 1987; that plaintiff consummate a sale of 990 Fifth Avenue by June 30, 1988; that so much of our interim order of February 27, 1986 as directed plaintiff to pay half of the carrying charges on 990 Fifth Avenue continue in effect until October 31, 1987; that between November 1, 1987 and December 31, 1987, defendant pay all of the carrying charges on 990 Fifth Avenue for as long as she remains in occupancy; that between January 1, 1988 and June 30, 1988, plaintiff pay all of the carrying charges on 990 Fifth Avenue; that plaintiff pay to defendant the sum of $3 million out of the proceeds of the sale of 990 Fifth Avenue less half the costs and taxes incurred thereon; that the property known as 37 Exchange Place, Westhampton Beach, New York, be distributed to defendant; that the property known as 539 Dune Road, Westhampton, New York, be distributed to defendant; that the property known as 100 Sunrise Avenue, Apt. No. 212, Palm Beach, Florida, and the cabana located at the same address, be distributed to plaintiff; that Nanco Construction Corporation appreciated in the amount of $2 million during the marriage, and that such appreciation is marital property in which defendant is entitled to a 20% share; that the properties located on Railroad and Review Avenues, Long Island City, New York, are marital property that were worth $4,462,119 as of the commencement of the action in which defendant is entitled to a 20% share; that the Hope Resources mortgage is marital property that was worth $248,550 as of the commencement of the action in which defendant is entitled to a 20% share; that the proceeds of the properties known as Beach Lane South of Dune Road and Beach Lane North of Dune Road, Quogue, New York, are marital property to be distributed to plaintiff; that the property known as 80 Dune Road, Quogue, New York, is marital property to be distributed to defendant; that the Schaeffer mortgage is marital property to be distributed to plaintiff; that defendant's motion for an order directing plaintiff to return certain jewelry be denied with leave to renew in the IAS Part; that the proceeds of the Dubuffet painting are marital property to be distributed to defendant; that the Twombly painting is marital property, and

that it be sold with the parties sharing equally in the net proceeds; that as of the commencement of the action the parties each possessed cash and other liquid assets in approximately equal amounts; that any taxes, interest or penalties that may be assessed against either or both parties with respect to any joint income tax returns heretofore filed by them be paid and borne equally by them to the extent attributable to disallowed tax shelters or to acts charged in the indictment to which plaintiff has pleaded guilty, except that any penalties attributable to such criminal acts be paid and borne entirely by plaintiff, and otherwise affirmed, without costs.

KUPFERMAN, J. P., SULLIVAN, MILONAS and ROSENBERGER, JJ., concur.

Judgment, Supreme Court, New York County, entered on December 18, 1985, unanimously modified, on the law and the facts, to provide that the parties share equally in the costs of providing the children with private school and college educations, summer camps, medical and dental care, and during their minority a policy or policies of insurance for hospitalization, surgical and major medical benefits; that defendant vacate 990 Fifth Avenue by December 31, 1987; that plaintiff consummate a sale of 990 Fifth Avenue by June 30, 1988; that so much of our interim order of February 27, 1986 as directed plaintiff to pay half of the carrying charges on 990 Fifth Avenue continue in effect until October 31, 1987; that between November 1, 1987 and December 31, 1987, defendant pay all of the carrying charges on 990 Fifth Avenue for as long as she remains in occupancy; that between January 1, 1988 and June 30, 1988, plaintiff pay all of the carrying charges on 990 Fifth Avenue; that plaintiff pay to defendant the sum of $3 million out of the proceeds of the sale of 990 Fifth Avenue less half the costs and taxes incurred thereon; that the property known as 37 Exchange Place, Westhampton Beach, New York, be distributed to defendant; that the property known as 539 Dune Road, Westhampton, New York, be distributed to defendant; that the property known as 100 Sunrise Avenue, Apt. No. 212, Palm Beach, Florida, and the cabana located at the same address, be distributed to plaintiff; that Nanco Construction Corporation appreciated in the amount of $2 million during the marriage, and that such appreciation is marital property in which defendant is entitled to a 20% share; that the properties located on Railroad and Review Avenues, Long Island City, New York, are marital property that were worth

$4,462,119 as of the commencement of the action in which defendant is entitled to a 20% share; that the Hope Resources mortgage is marital property that was worth $248,550 as of the commencement of the action in which defendant is entitled to a 20% share; that the proceeds of the properties known as Beach Lane South of Dune Road and Beach Lane North of Dune Road, Quogue, New York, are marital property to be distributed to plaintiff; that the property known as 80 Dune Road, Quogue, New York, is marital property to be distributed to defendant; that the Schaeffer mortgage is marital property to be distributed to plaintiff; that defendant's motion for an order directing plaintiff to return certain jewelry be denied with leave to renew in the IAS Part, that the proceeds of the Dubuffet painting are marital property to be distributed to defendant; that the Twombly painting is marital property, and that it be sold with the parties sharing equally in the net proceeds; that as of the commencement of the action the parties each possessed cash and other liquid assets in approximately equal amounts; that any taxes, interest or penalties that may be assessed against either or both parties with respect to any joint income tax returns heretofore filed by them be paid and borne equally by them to the extent attributable to disallowed tax shelters or to acts charged in the indictment to which plaintiff has pleaded guilty, except that any penalties attributable to such criminal acts be paid and borne entirely by plaintiff, and otherwise affirmed, without costs and without disbursements.