PATRICIA B. GREENWALD, Respondent, v JAMES L. GREENWALD, Appellant.

First Department, February 7, 1991

APPEARANCES OF COUNSEL

*Joan L. Ellenbogen* of counsel *(Marcia C. Goldstein* and *Kenneth Ludman* with her on the brief; *Ellenbogen & Goldstein, P. C.,* attorneys), for respondent.

*Irving Shafran* for appellant.

## OPINION OF THE COURT

SULLIVAN, J.

This appeal presents, *inter alia,* a challenge to the trial court's distribution of marital assets on a 50/50 basis where, according to the husband, for the seven-year period prior to the commencement of the divorce action, during which the parties had been separated, the marital assets enjoyed their greatest single period of growth, i.e., an increase in value of nearly [7] million, without contribution thereto, either direct or indirect, by the wife.

The parties, married on December 18, 1960 and the parents of a son, born February 21, 1964, separated in May 1980, when the husband left the marital home. At the time of their marriage, they lived in a rental apartment at 785 Park Avenue and neither the husband, then 33 years old nor the wife, 30, had assets of any significance. The wife was then employed full-time, earning $8,500 per year as a project director with Marplan, a market-research firm. Her employment was terminated in 1964 when she was in her seventh month of pregnancy. A few months after her son's birth she rejoined Marplan and worked full-time until 1966 when she resigned to care for her son, who was experiencing difficulties in adjusting to both parents working. She returned to work on a part-time basis in 1970, when the son entered kindergarten, and resumed working full-time in 1974 as an executive vice-president and director of research at Degarmo, an advertising agency, at an annual gross salary of approximately $75,000, which, with fringe benefits—car, garage and expense account —brought her total compensation to more than $100,000 per year. In 1980, Degarmo merged with D'Arcy, McManus, Masius, another advertising agency. Throughout the marriage, at least until their separation, the husband paid all the household bills and the wife retained her income.

At the time of the marriage, the husband was earning $13,000 per year at Katz Communications, Inc., for which he began working in 1956. He became assistant radio sales manager in 1964 and, within two years, was promoted to sales

manager of the radio division. He was named executive vice-president in 1971 and, four years later, in 1975, after the parties had been married for 15 years, became president and chief executive officer. In 1979, he earned $532,624. His W-2 salary for 1988 was $1,407,975.

Since the parties worked in related fields, he in the media and she in advertising, each was involved in the other's career. She turned to him for professional guidance, and he regularly sought her advice and counsel. For instance, the wife participated in the formulation of a strategy to secure the necessary votes for him to be elected to the presidency of Katz. Even after the husband left the marital home in 1980, the parties continued to maintain a close business and social relationship. They spoke regularly by telephone and frequently met for lunch or dinner, discussing their respective careers and seeking each other's advice and guidance. In at least one instance, at the husband's request, the wife interviewed a prospective Katz employee; on another, she gave the husband a new psychographics study for use by Katz salesmen. As found by the trial court, "Aside from not cohabitating, the parties' relationship has basically remained unchanged since their separation in 1980."

At the time of the parties' separation in May 1980, the son was 16 years of age, the wife a $125,000 per year senior vice-president at D'Arcy, McManus, Masius. The son continued to live with the wife. On March 10, 1982, the son, then 18, attempted suicide; the wife took him to a residential treatment program in Houston, Texas. In November of that year, she was terminated from her executive position because of the time she was devoting to him. After his return from Texas, the son resumed living with the wife. During this period of readjustment, the wife attended daily support meetings, accompanied the son on his psychiatric visits, engaged tutors for him and helped him with his studies. He earned a high school equivalency diploma, attended Bennington College for three semesters until May 1984 and then returned to live with the wife for 2½ years more until he moved into his own apartment in December 1986. That apartment was purchased jointly by the parties pursuant to a written agreement, which provided for equal contribution to the cost, expenses and maintenance of the apartment.

Meanwhile, the wife freelanced as a market researcher until 1984, when she and a partner formed Holtzman and Greenwald market researchers. The company, however, was

dissolved after 1½ years and the wife returned to freelancing. In 1986, she and a former colleague formed Cox and Greenwald, an advertising agency, which was dissolved in October 1988. Since March 1989, she has been a consultant with Barham and Partners, an advertising agency. In 1989, at the time of trial, she was being paid $300 per diem.

From the time he left the marital home in May 1980, the husband voluntarily contributed to the support of the wife, who, in turn, supported the son. In April 1986, however, after learning that the wife's partner was taking a double salary and she none, he terminated all support by denying the wife access to a joint checking account. The wife commenced a support proceeding and was awarded $11,000 monthly in temporary support, which the husband has paid to date.

On August 19, 1987, 27 years after their marriage and seven years after the husband vacated the marital apartment, the wife commenced an action for divorce, alleging abandonment, which the husband did not contest. After an eight-day trial of the financial issues, conducted two years later, the trial court granted the wife a 50% interest in the marital property accumulated to the date of the commencement of the action, one half of the shares of stock in the Katz Employee Stock Ownership Plan Trust Fund (ESOP) account held by the husband or, in the event of termination of the plan (as has happened), payment of one half of the proceeds of the sale of such shares; evaluated the marital assets already in her control at $2,217,556 and those in his control at $11,083,529 and, in addition, directed the husband to pay her a distributive award of $4,432,986 and to transfer $434,974 to her from his individual retirement accounts to effectuate an equal distribution.

In so ruling, the court found that each party had made significant contributions to the acquisition of marital assets, although the husband had been the primary income producer. Unlike the husband, the court held, the wife had essentially maintained dual roles during the marriage. She contributed directly to the success of his career through her independent income and assistance; in her role as wife, mother, homemaker and home manager, she contributed indirectly. The court found that these contributions continued after the parties' physical separation. Even if this were not the case, the court noted, by the time of the 1980 separation, the marriage was already "long-term" and the "momentum for the appreciation of the marital assets * * * already underway." Based on

these circumstances and, citing *Connor v Conner* (97 AD2d 88, 96) for the proposition that marital assets should be divided equally unless such a division would be inequitable, the court found that an equal division was "just, fair and right".

Since the court's decision was not rendered until five months after the trial's conclusion—during which time the husband allegedly suffered a substantial change in financial circumstances due to market conditions beyond his control—and was incorporated, he claimed, into the judgment without consideration of the attendant tax implications, resulting in a financial windfall to the wife well in excess of 50% of the marital assets awarded, the husband moved for renewal, reargument and reconsideration as well as a reopening of the trial and modification of the decision so as to rectify the judgment's inequities. In addition to alleging reliance on stale valuation figures from the trial notwithstanding a significant downturn in the securities market which substantially reduced the value of certain of his assets, the husband also claimed that the court evaluated his ESOP as an active asset while distributing it as a passive asset by imposition of a qualified domestic relations order (QDRO). The court denied the motion in its entirety. The husband appeals from both the judgment and order, which appeals have been consolidated. Primarily arguing that the court erred in awarding the wife a 50% participation in the distribution of all marital assets, he cites her lack of contributions to the acquisition or appreciation of assets during their seven-year separation, during which the most substantial appreciation in value of the marital assets occurred.

■ Pursuant to section 236 (b) (5) (c) of the Domestic Relations Law, "[m]arital property shall be distributed equitably between the parties, considering the circumstances of the case and of the respective parties." It is axiomatic, of course, that equitable distribution does not necessarily mean equal distribution. *(Rodgers v Rodgers,* 98 AD2d 386, 390-391, *appeal dismissed* 62 NY2d 646.) Rather, courts must use the flexibility and elasticity with which they are empowered "to mold an appropriate decree because what is fair and just in one circumstance may not be so in another" *(supra,* at 391).

■ In essentially seeking to deny the wife an equal share of the post-separation appreciation in value of the marital assets, the husband argues that, for all practical purposes, although the parties were married for 27 years, the marital partnership terminated in May 1980 when, after 20 years of marriage, he

left the marital residence. In so arguing, the husband ignores the wife's significant post-separation contributions to the marriage and her self-sacrifice in that regard. It is beyond dispute that for the seven-year span, as well as throughout the marriage, she was the primary caretaker of the parties' son.

On this issue, the trial court found that the wife's "responsibilities in regard to the son between 1980 and 1983 were extremely intense due to the difficulties he was experiencing [as] an adolescent." As this record amply demonstrates, it was the wife who, during the period of time that the husband contends she made no contribution, directly or indirectly, to the appreciation in value of the marital assets, bore the brunt of dealing with the couple's troubled son; it was she who saw to it that he obtained a high school equivalency diploma; and it was she who lost her executive position because of the time she was spending on him. The husband, on the other hand, had only one employer throughout the entire marriage, and there is no dispute that as a result of the wife's efforts, direct and indirect, he was able, in large measure, to achieve a remarkable degree of success in his career.

Moreover, even after the husband left the marital residence, the parties continued to maintain a close business and social relationship, frequently meeting for lunch and dinner and regularly speaking by telephone. They would, on these occasions, seek the other's advice and guidance regarding their respective careers. And, of course, throughout this period, they shared an ongoing concern for their son.

█ In this regard, we find far-fetched the husband's argument that the wife should not share in any appreciation of post-separation marital assets because she deliberately refrained from bringing a divorce action in order to share in such appreciation. It is much more in keeping with human nature to take what is due now rather than later and run the risk of its loss or depreciation. In any event, the wife's explanation that she did not seek a divorce earlier because she hoped for a reconciliation is by far the more plausible.

█ Contrary to the husband's claims, this record is bereft of any evidence that, prior to the commencement of this action, his post-separation earnings were used in the acquisition or affected the appreciation of any of the marital assets as to which the court directed an equal division. For example, although the husband purchased an apartment after the parties separated, the record indicates, and the trial court

found, that in purchasing the apartment he used funds from his two Merrill Lynch brokerage accounts, which are marital assets. Thus, while the wife did not contribute any home-maker services with respect to the husband's apartment, she did, in fact, contribute to its purchase, which was achieved by exchanging one marital asset for another. The husband's reliance on *Gross v Gross* (160 AD2d 976, 978) therefore misses the mark.

The husband also cites the *Gross* court's affirmance of the trial court's award of a 25% interest to the wife in her husband's pension and stock savings plan. There, however, at the time of the commencement of the action, the wife had resided with the husband for only 3 of the 14 years that he had worked for the employer. Accordingly, the court found that the wife's "contributions to this phase of the husband's career have been less than substantial." *(Supra,* at 978.)

Here, in contrast, the husband and wife had resided to-gether for 20 of the 27 years that he was employed by Katz prior to the commencement of the action. Virtually all of the husband's shares of stock in the Katz ESOP, established in 1972, come from company profits accumulated during the time the parties resided together. In fact, by 1980, when he left the marital home, the husband had been allocated virtually the maximum number of shares allowable from company profits. With the exception of 359.16 shares he received in 1983, all of the other shares received since December 31, 1980 are attrib-utable to the forfeitures of departed employees.

In that regard, the husband, citing the court's valuation of the husband's ESOP as of December 31, 1987, the closest date to the commencement of the action, argues that the court correctly found the ESOP to be an active asset. He further asserts that the court did so "in recognition that its substan-tial appreciation in value was the product of [his] labors," pointing to the increase in value of his ESOP from $694,618.93 at the time of the parties' separation in May 1980 to $3,152,078.93, as of December 31, 1988, a post-separation appreciation in value of $2,457,460. The court, however, he argues, failed to take the "next logical step" by distributing the ESOP so as to reflect the husband's disproportionate contributions to the acquisition and appreciation in value of this asset in comparison to the wife's "de minimis" role. In that regard, the husband notes that the value of the ESOP and each participant's interest therein is directly related to

Katz's financial success, for which he was primarily responsible.

■ We note that in distributing the husband's ESOP, the court's decision referred to the balance of shares in the ESOP as of December 31, 1987, the date closest to the commencement of the action. (The number of shares specified in the court's decision—168,774.21—is apparently a typographical error, since the ESOP report for the year ending December 31, 1987, reflects a balance of 168,664.21 shares.) The judgment, however, awarded the wife 50% of 170,297.41 shares, the balance of shares in the account as of December 31, 1988. Since the acquisition of marital property ceased at the time the action was commenced, the court erred in dividing the ESOP on the basis of the number of shares in the husband's account as of December 31, 1988 and should have based its award on the number of shares held as of December 31, 1987 —168,664.21.

■ As to the valuation of the shares, courts have consistently recognized that assets such as undeveloped real estate or mutual funds, which appreciate in value strictly as a result of random market fluctuations or the efforts of others, constitute passive assets, while assets that appreciate due to the efforts of the titled spouse are active. *(See, Price v Price,* 113 AD2d 299, 307-308, *affd* 69 NY2d 8, 18; *Jolis v Jolis,* 98 AD2d 692; *Nolan v Nolan,* 107 AD2d 190.) Passive assets should generally be valued as of the trial date so as to prevent a windfall to the titled spouse if the asset has increased in value; active assets should generally be valued as of the commencement date of the action in order to benefit the titled spouse, since any appreciation in value is the product of that spouse's labors. *(See, Wegman v Wegman,* 123 AD2d 220, 234, 236.)

■ To the extent that the husband suggests that the ESOP should have been valued as of the date of the parties' separation, suffice to say, the valuation date may not be prior to the commencement of the divorce action. (Domestic Relations Law § 236 [B] [4] [b].) On this question, the court, during the trial, stated that the Katz ESOP is "[c]learly an active asset" and that it would be "cut off * * * at the very latest" as of the commencement of the action. We agree that the ESOP is an active asset which should be valued as of the commencement of the action. Accordingly, we value the asset at $2,881,468.45, its value as of December 31, 1987, the date closest to the commencement of the action, and modify the judgment to

award the wife the December 31, 1987 value of 50% of the shares held in the husband's account as of that date.

■ The husband argues that the trial court improperly classified his two Merrill Lynch security accounts as passive instead of active assets and valued them as of the trial date rather than the date of the commencement of the action. Merrill Lynch account No. 825-96160, established by the husband during the marriage, had a balance of $2,268,955 on August 28, 1987, the date the action was commenced. It was valued at $2,331,844 as of July 28, 1989. In arriving at the value of this asset, however, the court deducted $500,000, which the husband received from the sale of his apartment, and then added withdrawals of $382,752.77 made by the husband for his personal use. Significantly, at no time after February 27, 1987, six months before the commencement of this action, did the husband contribute any part of his earnings to this account or to his second Merrill Lynch account. Thus, any subsequent appreciation in the value of this account was due to the accrual of interest and dividends.

The other account, No. 825-96356, was opened on February 27, 1987, funded solely by the proceeds from the sale of 247,000 shares of Katz stock, which the husband had acquired long before the commencement of the action. In fact, he had obtained 220,000 of these shares, or 89% of the total, by December 31, 1978, well over a year before the parties' separation. Of the 27,000 after-acquired shares, 5,000 were acquired on September 14, 1981; 7,000 on August 31, 1982; 5,000 on July 22, 1983 and 10,000 on September 24, 1984. On September 16, 1986, the husband sold all 247,000 shares for $4,299,661.39, which he deposited the next day in his then-existing Merrill Lynch account No. 825-96160.

The husband thereafter, on February 27, 1987, transferred $4,000,000 from the existing account into a new Merrill Lynch account, No. 825-96356. One month later, on March 26, 1987, he transferred $600,000 back to account No. 825-96160 to pay income taxes due on the sale. Thus, five months prior to the commencement of this action, there was $3,400,000 in account No. 825-96356, representing the after-tax proceeds from the sale of the Katz stock. No additional funds were ever deposited into this account, although the husband made three withdrawals totaling $293,565.60, which, despite his inability to explain satisfactorily the disposition thereof, the trial court did not add back. Apparently, these funds were transferred to another investment account of the husband's. The husband

also withdrew $25,000 to invest in an outpatient nursing care facility, which the court did not separately value; instead, it added the $25,000 back to the value of the account. On the date of the commencement of the action, account No. 825-96356 had a value of $2,982,876, which, after taking into account the three transfers of $293,565.60 and adding back the $25,000, was valued at $2,725,856 as of the date of trial.

■ Contrary to the trial court's finding, we are persuaded that Merrill Lynch account No. 825-96160 is directed and managed by the husband. As his testimony shows, although a Merrill Lynch broker is responsible for the administrative aspects of the account's operation, the husband, not the broker, determined how the stock portfolio was to be administered. The same holds true for the other Merrill Lynch account, No. 825-96356, which was directed and managed by the husband and his investment advisor, Mr. Settle. Together they would decide which securities should be bought and sold and the number thereof, as well as the timing and other details of the transaction. In effect, the husband's directions, after consultation, were executed by his agent, Settle.

The wife argues that the husband's lack of familiarity with some of the account statements with which he was confronted at trial by opposing counsel belies his claim that he managed the account. In finding these two accounts to be passive, the trial court relied upon this unfamiliarity. We find it to be of no moment. As this record demonstrates, the husband exhibited detailed knowledge about his accounts, notwithstanding his inability to read an account statement, particularly one in a format different from that of the monthly statements he ordinarily received. He was able to identify and approximate the number of shares held and give the time of purchase and price, as well as other relevant details. Since, on this record, it stands unrebutted that the husband alone made the transaction decisions on account No. 825-96160 and, jointly with his advisor, Settle, made them on account No. 825-96356, both accounts were, even by the wife's definition, active assets. Any increase or decrease in value was due to the husband's investment strategy and decisions, not mere market conditions. In that regard, however, we are of the view that for purposes of determining whether an asset is active or passive, it is of no significance that the financial decisions were made exclusively by the titled spouse's financial advisor. Though he/she acts through an agent, the decisions are still those of the titled

spouse and the results, be they beneficial or adverse, are the product of his/her labors, not random market fluctuations.

In any event, as to account No. 825-96160, the first of the two, since the difference between the August 1987 balance of $2,268,955 and the July 28, 1989 value of $2,331,844 is only $62,889, a modification to effectuate a distribution based on the smaller balance at the time of the commencement of the action would not be appropriate since, if the other account, No. 825-96356, were valued on the earlier date, the wife would share in a fund greater by $257,020 inasmuch as the husband thereafter withdrew $293,565.60, for which, as noted, he was not charged.

■ The husband also challenges the trial court's valuation of his interest in Sandler Associates, a partnership formed to engage in the investing and trading of securities, in which he became a limited partner in 1979, as a passive asset. The trial court properly found this asset to be passive in nature since the husband's interest was that of a limited partner, who had no voice in the partnership's investments or trades. While a general partner may have a fiduciary duty to a limited partner, the former is not the latter's agent. Thus, any appreciation in value was purely passive. The asset was valued as of the date of trial on the basis of the husband's 1988 schedule K-1, the most current provided at trial, which showed an after-tax capital account at the end of that year of $3,320,726, and the wife awarded a 50% participation. The husband also claims that except for an initial $100,000 contribution made in February 1980, a few months prior to the parties' separation, the account "was funded with post-separation income". This claim, however, is belied by the trial record, which shows that the husband's investments in Sandler in 1984 ($50,000), 1985 ($50,000), 1986 ($50,000) and 1987 ($50,000) were all made from withdrawals from his Merrill Lynch accounts. Thus, there is no evidence regarding his use of post-separation income; the husband merely exchanged a portion of one marital asset to invest in another.

■ The husband claims that the court failed to take into account a tax liability resulting from Internal Revenue Service audits of his investment in three tax shelters, as well as certain marital debts and other liabilities. While he claims, as he did at trial, that his tax liability could exceed $1,000,000, there admittedly has been no determination that the husband owes any taxes for these investments and thus the amounts he claims—"[t]he two oil wells, minimal. Under $50,000, I

presume. And the Arbitrage could be in excess of $1 million" —are purely speculative. Furthermore, unlike the situation in *Capasso v Capasso* (129 AD2d 267, *lv denied* 70 NY2d 988), upon which the husband relies, neither of the two certified public accountants who appeared on his behalf testified with respect to any potential tax liabilities. As the husband's accountants, they prepared his income tax returns and handled any tax audits. Since the only evidence in the record with respect to any potential tax liability is the husband's highly speculative and ambiguous testimony, the court rightfully rejected it and made no provision for such liability.

Similarly, the court rejected the husband's claim that $1,207,584 of debt, consisting of $900,000 in bank loans and $307,584 in personal loans, should be apportioned between the parties. Without a single reference to the record, he argues that the "marital debts were incurred by [him] in acquiring assets that the court deemed marital and which were distributed on an equal basis." In his testimony, however, the husband failed to furnish any specifics as to any of the alleged loans. Indeed, in describing his outstanding loans "at the present time", he did not even state that they were taken out prior to the August 1987 commencement of this action. He offered no testimony as to what loans, if any, he had at that time.

Nor did he introduce any documentary evidence of these alleged obligations. His statement that he has an $800,000 loan at the Irving Trust Company embracing "three different loans taken out at three different times" is hardly an adequate basis upon which to classify these loans as marital. His testimony that he "[h]as a loan at Chemical Bank" is similarly insufficient. As to the additional loan allegedly incurred in acquiring two investments, Plaza West Associates and East 56th Street Associates, it is noteworthy that, notwithstanding the husband's claim, Plaza West is not included in the list of marital assets. That the husband may have undertaken an obligation to underwrite this investment is thus irrelevant. While East 56th Street Associates was found to be marital property, the parties stipulated to its value at trial. Presumably, that stipulated value took into account any outstanding loan undertaken to finance its purchase.

With respect to the personal loans, they are suspect at best. The husband argues that a debt of $307,584 to a social friend constitutes a marital obligation. When questioned, he gave three different answers as to why he undertook this obliga-

tion. In light of such patent inconsistencies and the husband's failure to demonstrate the marital purpose for the loan, it was properly disregarded. A review of the record reveals a clear failure of proof on this point.

■ The husband also argues that the court erred in failing to consider the tax consequences of the wife's $4,432,986.08 distributive award, as required by Domestic Relations Law § 236 (B) (5) (d) (10). As the trial court noted, however, the husband failed to offer any evidence on this issue. While this court has taken into consideration the tax consequences of the possible sale of a townhouse valued at $1,000,000, the proceeds of which were to be distributed equally, where the issue was not raised at trial (*Teitler v Teitler,* 156 AD2d 314, *appeal dismissed* 75 NY2d 963), there both parties submitted posttrial briefs on the subject and the record made it clear that a substantial capital gains tax liability would accrue upon any sale. Here, it is not at all clear that the husband will have to sell off assets to pay the wife's distributive award. In light of his wealth and substantial income—$2,967,975 for the years 1988 and 1989—he has the capacity to borrow should he want to avoid disposing of assets. Furthermore, it appears that a significant portion of his assets are in tax-free investments. Moreover, as already noted, his investment in Sandler Associates is worth over $3 million after taxes. Thus, we are not persuaded on this record that the husband will have a tax liability.

■ Finally, the husband asks that this court exercise its discretion, in the interest of justice, and direct a remand to the trial court for further evidence-taking in order to prevent a fundamental injustice in light of the fact that "certain of his assets distributed by the trial court have been reduced by as much as 50%." As his papers in support of his postjudgment motion for reargument and a reopening of the trial demonstrate, the husband's basic argument in this regard is that during the 10-month period after the trial two of the marital assets, namely, Merrill Lynch account No. 825-96160 and the Sandler Associates investment, declined in value, the former by $1.6 million and the latter by $300,000. However unfortunate, this is an irrelevant circumstance. As already noted, Domestic Relations Law § 236 (B) (4) (b) provides that "[t]he valuation date or dates may be anytime from the date of commencement of the action to the date of the trial". Thus, posttrial changes in value may not be used to reallocate the distribution of marital assets to strike a more equitable bal-

ance. The reason for the rule is clear. Recognition of such changes to effect a modification of the distribution "would effectively undermine the finality of judgments in matrimonial actions". *(Siegel v Siegel,* 132 AD2d 247, 254, *appeal dismissed* 71 NY2d 1021.)

In any event, the husband's application was based on a highly selective disclosure as to the status of the 22 items of marital assets. He neglected to provide any information as to the appreciation of any of the assets he held. For instance, the husband did not disclose the amount he received from the sale of the 170,297.41 shares of Katz stock that had been in his ESOP account.* At trial, their value, as of December 31, 1988, was shown to be $18.51 per share and all indications were that the stock had appreciated in value. That the ESOP was terminated and that Katz underwent a major reorganization, as part of which the husband reinvested $1.5 million of his own money in highly illiquid securities subject to a stockholders' agreement restricting his right to sell, is not a legitimate basis upon which to reallocate the distribution of marital assets.

We have examined the husband's other contentions and find that no further modification in the court's distribution of the marital assets or valuation thereof is warranted.

Accordingly, the judgment of the Supreme Court, New York County (Jacqueline W. Silbermann, J.), entered June 11, 1990, should be modified, on the law and on the facts, and in the exercise of discretion, to award plaintiff the value as of December 31, 1987 of 50% of the number of shares of the Katz stock held in defendant's ESOP account on that date and to adjust the amount that defendant is to pay over to plaintiff accordingly, and, except as thus modified, affirmed, without costs or disbursements. The order of the same court and Justice, entered July 19, 1990, denying defendant's motion to reargue, renew, reconsider and/or reopen the trial, should be affirmed, without costs or disbursements.

KUPFERMAN, J. P., CARRO, MILONAS and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, entered June 11, 1990, unanimously modified, on the law and on the facts, and in the exercise of discretion, to award plaintiff the value as of December 31, 1987 of 50% of the number of shares of the

---

* It was ultimately determined that the husband received $3,405,948 from the sale, of which, according to the judgment's alternative provision in the event the stock were sold, the wife was to receive one half.

Katz stock held in defendant's ESOP account on that date and to adjust the amount that defendant is to pay over to plaintiff accordingly, and, except as thus modified, affirmed, without costs or disbursements. The order of the same court and Justice, entered July 19, 1990, denying defendant's motion to reargue, renew, reconsider and/or reopen the trial, unanimously affirmed, without costs and without disbursements.

Defendant's application for vacatur of the money judgment entered on August 20, 1990 is denied.