Pamela P. Zelnik, Appellant-Respondent, v Michael R. Zelnik, Respondent-Appellant.

First Department, July 25, 1991

318

### APPEARANCES OF COUNSEL

*Alan D. Scheinkman* and *Eleanor Jackson Piel* for appellant-respondent.

*Mark D. Lebow* of counsel *(P. Rivka Schochet* with him on the brief; *Coudert Brothers,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

SULLIVAN, J. P.

In this matrimonial action the parties cross-appeal from a judgment terminating the marriage, awarding the wife physical custody of their nine-year-old daughter—the only issue of the marriage—determining issues of equitable distribution and providing for maintenance and child support. Married on September 15, 1979, each for the second time, the parties separated in December 1982, although there were several subsequent periodic but unsuccessful attempts at reconciliation.

The parties, now 46, met in September 1973 through their employment at Yves St. Laurent Clothing and Shirt Company (Yves St. Laurent), which eventually expanded to become

Bidermann Industries U.S.A., Inc. (Bidermann), a clothing manufacturer grossing $250,000,000 per year and subsidiary of Bidermann, S.A., a large French clothing concern. At the time, the husband was an assistant to Maurice Bidermann and the wife Yves St. Laurent's creative director, in charge of advertising, public relations and promotion. Both earned approximately $30,000 annually. She had previously worked for Revlon in the marketing and promotion of new products. He had previously held an executive position with Pierre Cardin. As a result of their romantic relationship, the wife terminated her employment with Bidermann. The husband subsequently became president of Yves St. Laurent and, later, Bidermann.

After leaving Yves St. Laurent, the wife, with some success, engaged in the free-lance writing of fashion and social articles but eventually had to give this up when the full responsibility of raising their daughter fell on her. She was also hindered in her writing by the need to devote time and attention to the operation of two real estate properties which the husband had acquired. It is not disputed that for a substantial part of their life together the husband was away from home on business matters.

In September 1975, before they began to live together, the parties leased an apartment in their joint names. In September 1976, at a time when they were living together but before the marriage, the husband, at the wife's urging, purchased approximately 60 acres in Esopus, New York for $95,000. On June 29, 1979, 2½ months before their marriage, the husband purchased, as a family residence, a house at 36 Grove Street in Manhattan for $435,000, making a $50,000 down payment. Two months later, on August 29, 1979, the husband was divorced from his first wife, from whom he had been long separated. The parties were married 2½ weeks later.

With the assistance of architects, the wife developed a plan to merge a vacated rental unit at the Grove Street house into the owner's living area, thereby creating a triplex. She hired a designer and supervised the construction, which cost between $300,000 and $350,000. One unit is currently rented; the other, the triplex, some 3,500 square feet consisting of three bedrooms, kitchen, dining room and basement, is currently occupied by the wife and child. The wife's appraiser valued the Grove Street house at approximately $1,800,000 as of August 15, 1988 and concluded that the renovation had increased its value; the husband did not submit an appraisal of his own. The property is subject to a 25-year, $862,500 varia-

ble rate mortgage, obtained in 1984, which assumed an earlier $400,000 mortgage.

Several years after the purchase of the Esopus property and during the marriage, the parties began to operate a horse farm there. The wife was significantly involved in the effort to place it on a professional footing; she brought in a horse trainer and helped develop a plan for financing; she suggested an architect for the construction of a horse barn and contributed to the building plans. Over 10 years, the Esopus farm was, by 19 separate deed transactions, expanded to 416 acres.

The management of the farm, especially the enormous sums expended on the construction of a "state of the art" horse barn, complete with hair dryers for the horses, olympic-size riding arena, viewing and office space and a $30,000 manure-removing machine, was a source of concern to the wife. During the years 1983 through 1984, the farm's operating expenses were running at approximately $50,000 monthly. By 1984, the financial drain caused the husband to take out a second mortgage on the Grove Street house, although, at another point, he justified the refinancing with the comment, "[F]inancially, things [are] bad." In any event, the husband continued to invest money in the Esopus property. He estimated that he spent $1.4 million in purchasing horses for which he received "a couple of hundred thousand dollars." Another $200,000 was expended on a reconstruction of the farmhouse. The horse trainer spent lavishly. The appraised value of the Esopus farm, as of the time of trial in November 1988, was $2,660,000. In a March 1985 financial statement, the husband valued the Esopus horse farm at $3,285,200.

Eventually, the husband and Maurice Bidermann had a falling out, leading ultimately to the husband's termination of his employment with Bidermann on October 31, 1987. The husband testified that in October 1987 he received $4,570,000 in payment of his stock interest in Bidermann, S.A., and other companies. This was confirmed by letter from his counsel to the wife's attorney. According to the husband, he received a 10% interest in Bidermann, S.A., as a "promise" in 1973, prior to the marriage. He was unable, however, to produce any document evidencing this transaction and conceded that a 1982 employment agreement with Bidermann contained no such promise.

During the trial, the wife fortuitously received a copy of the parties' 1987 joint tax return, signed only by the husband,

from the Internal Revenue Service, which requested her signature. This document showed a sale of the stock by the husband to Maurice Bidermann for $8,000,000. Other documents subsequently admitted in evidence confirmed the sale and price. Recalled to the stand, the husband testified that, in addition to the $4.5 million received on account of the sale of the Bidermann, S.A., shares, he was also to receive $1.5 million in "severance" as well as a $2 million "consulting fee". He further testified that since he did not receive either the severance or consulting fee he brought suit against Bidermann, which was settled in March 1988.

The husband also testified that the stock was worth $1 million in September 1979 but, despite its increase in value after September 1979 due to Bidermann's acquisition of the Ralph Lauren line, its value dropped to "near zero" by the end of 1982 as the result of a threatened bankruptcy of Bidermann, S.A. The husband insisted that the stock regained its $1 million value during the period between 1982 and 1986. After extended testimony on the subject and a request by the wife's counsel that she be allowed to serve interrogatories in France, as well as the court's observation as to the husband's contention that he became the owner of the stock in the 1970's that "[t]here has been no proof either way because we do not have either the stock or the stock book or records of any law firm or any records of Bidermann which would show us," the husband abruptly conceded that his stock interest in Bidermann, S.A., was marital property.

The record indicates that, throughout the marriage, the husband earned a sizeable income, which declined somewhat with the onset of this litigation. In 1980, he earned $322,000, in addition to which Bidermann contributed $1,600 monthly towards his housing costs. On September 1, 1982, he and Bidermann entered into an employment agreement, which allowed termination only for serious cause and provided the husband with a base 1982 salary of $350,000, a 1983 salary of $400,000 and 1984 salary of $500,000, as well as a formula for the payment of a substantial annual bonus based on profits. In 1983, he earned $2,125,425 in salary, in 1984, $2,633,704; he also received $1,600 monthly as a housing allowance. In 1984 he also claimed a loss of over $624,000 from the farm operation. In 1985, he reported wages of $1,295,620 and a loss of nearly $900,000 from the farm operation; his reported wages were $810,466 in 1986 and he reported a $631,643 loss in the farm operation. Thus, the parties' tax returns for the three

years, 1984/1986, showed a loss of over $2 million in the farm operation in addition to losses of approximately $2 million in other partnership ventures. In 1987, he reported $84,229 in wages, as well as a capital gain of $3,937,388. The farm operating loss was $484,286 and another $414,156 was sustained in partnership losses.

In April 1984, after the wife had commenced a separation action, the parties entered into a separation agreement acknowledging that they were living apart, with the wife and child residing in the Grove Street house and the husband in his own apartment. The agreement, which was filed with the New York County Clerk on January 13, 1989, during the trial, also provided for the payment of $5,000 monthly to the wife for combined support and maintenance, as well as the wife's and child's medical and dental bills and the child's educational expenses. Custody of the child was to be shared jointly, although she would "make her home with her mother" at the Grove Street house, which the husband was to maintain by paying "all mortgage, tax assessments, the utilities, telephone and all repairs for same." These expenses come to approximately $9,700 monthly. The husband was to have liberal visitation rights.

The agreement also provided for a $50,000 advance to the wife, to be credited against a future equitable distribution award, for the commencement of a business for the manufacture and sale of children's clothing, to be known as "Flying Charges" in which the husband would cooperate and to which he would contribute his business acumen. The business never proved profitable.

The testimony showed that the wife assisted the husband in his business career and continued to do so even after the parties ceased living together. She gave advice, entertained his business associates and actively promoted his career. She arranged, for instance, for the husband to be interviewed for a special article entitled, *The Five Most Powerful Men in Tailored Clothing*, which appeared in the January 11, 1982 edition of "Menswear", a well-read fashion trade publication. The article described the husband as "one of the original players of the designer name game, and maybe the best" and cited his "enormous power, talent and influence." Even after executing the 1984 separation agreement, the husband visited the wife and daughter at the Grove Street apartment several times a week and had dinner with them. During the time they were living together, the husband discouraged the wife from

pursuing a career of her own, reasssuring her that she was "doing much better than all [those people at Bidermann making enormous amounts of money], you are married to me."

In November of 1984, the wife opened a clothing boutique, which failed and was closed at the end of 1985. In November 1985, with a $50,000 loan, she opened a children's hair salon, still functioning, at F.A.O. Schwarz, from which she draws no salary or income. There is, at present, a $35,000 outstanding balance on the $50,000 loan. During the period from July 2, 1984 to January 17, 1988, pursuant to the separation agreement, the husband advanced the sum of $270,269.52 to the wife for a business, "Shooting Star". In all, $354,829 in Shooting Star losses was used in the parties' 1984, 1985, 1986 and 1987 joint tax returns to reduce taxes.

In its initial decision on June 21, 1989, the court found the Grove Street house to be the husband's separate property and declined to award the wife any interest in the appreciation of its value from the time of the marriage. As to the Esopus farm, the court held that only the portion acquired during marriage and prior to the execution of the 1984 agreement could be considered marital property. Accordingly, it awarded the wife 50% of the value of that portion of the farm acquired between 1979 and 1984 and valued her interest therein at $220,350. The court declined to award her any percentage of the increase in value of the portions of the property found to be separate property.

The court valued the Bidermann stock as of the commencement of the action in 1986 at $4,500,000, subject to reduction by the estimated amounts attributable to capital gains tax. Although admitting that the husband had been "evasive and offered little if any cooperation" in resolving the valuation issue, the court accepted his valuation, deducting, without explanation, $70,000, and awarded the wife $880,000, 25% of the net amount. The court also held that the husband was entitled to a $220,000 credit for his contributions to the wife's business, Shooting Star. It divided the furniture, personal property and value of the horses. After credits and adjustments, the wife was awarded $880,350, which was to be paid within seven months, when the husband would receive his final $1 million payment from Bidermann.

On the issue of support, the court allocated 50% of the $5,000 monthly payment provided for in the parties' agree-

ment to child support (not including the husband's obligation to make additional payments directly or by reimbursement for other items of child support), which was to continue until the child's emancipation. The court limited the payment of maintenance to the wife to four years and permitted the wife and child to remain in the Grove Street house for two years while requiring the husband to pay all of the expenses thereof, including mortgage interest, taxes and utilities. It further provided that when the wife vacates the Grove Street house, the husband must pay as additional child support one half of the rent at the wife's new residence up to a maximum of $3,500 per month.

Finally, the court treated the April 19, 1984 agreement as a separation agreement and awarded the husband a divorce on the ground of the parties' having lived separate and apart for more than a year pursuant thereto and awarded the wife a divorce on the ground of cruel and inhuman treatment. The issue of counsel fees was left for a hearing. The court subsequently, on October 27, 1989, amended its decision to award the wife a 50% interest in the enhanced value of the Esopus farm, amounting to $591,500, brought about by the construction of the barn. After other additional changes to correct technical errors, the net distributive award to the wife was calculated at $1,466,850, which the husband was to pay in 90 days. The subsequently entered judgment changed the payment provisions of the distributive award, providing for payment in two installments, i.e., 50% upon the husband's receipt of his payment from Bidermann, but no later than July 1, 1990, and 50% on or before the wife's vacating the Grove Street house.

The parties cross-appeal; the wife, *inter alia,* from the court's holding that the Grove Street house was the husband's separate property and limiting her use of the house to only two years; the limitation of the payment of maintenance to only four years; the undervaluation of her share in the husband's Bidermann stock and the use of the 1984 agreement as a separate agreement for purposes of fixing a cutoff date to value assets or as a basis for a conversion divorce. The husband challenges, *inter alia,* the four-year maintenance award and two-year right of occupancy in the Grove Street house as excessive, the award of certain "valueless" tax shelter investments solely to him without allocating any portion of their liabilities of approximately $500,000 to the wife and

the award of an increased distributive share of the Esopus farmhouse barn.

■ With respect to the Grove Street property, we reject the wife's argument that it should have been regarded as marital property. Domestic Relations Law § 236 (B) (1) (d) (1) defines separate property narrowly as "property acquired before marriage". *Ryan v Ryan* (123 AD2d 679), relied upon by the wife, is clearly distinguishable. There, the nontitled spouse, in contemplation of the parties' impending marriage, contributed her own savings to the purchase price and immediately after the closing in the month preceding the marriage helped decorate and furnish the house and painted the interior. Title was taken in the husband's name only because the wife's employment kept her from the closing. Their joint account provided the funds for the mortgage payments and other household expenses.

Contrary, however, to the trial court's ruling that the wife should not be awarded any interest in the increased value of the Grove Street property on the ground that it was a "passive asset" that increased in value due solely to market conditions, we find that the appreciation in value should be considered marital property and divided equally. The statutory definition of separate property excludes therefrom the increase in value of the property "to the extent that such appreciation is due in part to the contributions or efforts of the other spouse." (Domestic Relations Law § 236 [B] [1] [d] [3].) The Court of Appeals has spoken on the proper interpretation of this section, holding in *Price v Price* (69 NY2d 8, 11) that "an increase in the value of separate property of one spouse, occurring during the marriage and prior to the commencement of matrimonial proceedings, which is due in part to the indirect contributions or efforts of the other spouse as homemaker and parent, should be considered marital property". As *Price* makes clear, the question of whether the nontitled spouse's role contributed to the appreciation "depends primarily upon the nature of the asset and whether its appreciation was due in some measure to the time and efforts of the titled spouse." *(Supra,* at 18.) Accordingly, the wife is entitled to an award based upon the appreciation of the property unless the appreciation was completely unrelated to any effort expended by her and due solely to the fluctuations of the real estate market. Here, the evidence indicated that the property underwent significant renovations, which, in the unrefuted opinion of the wife's expert, contributed to the

appreciation. The wife established that she contributed to the planning and supervision of the renovation and thereafter to the maintenance of the marital premises. While the wife's contribution in the instant case consisted of time and effort, not the investment of funds, it is no less worthy of recognition.

■ It is clear that the improvements to the Grove Street property, purchased just 2½ months before the marriage, were paid for after the marriage. The parties' 1980 joint return reflects $21,425 spent in capital improvements at Grove Street. The 1983 return shows $100,500 spent as of July 1, 1981. Both sums were well within the husband's reported gross earnings for those years. Although the husband argues otherwise, there is nothing to indicate that the payments for the renovation came from any source other than postmarriage earnings. It was incumbent upon him to show that the improvements were funded out of separate property. *(See, Lischynsky v Lischynsky,* 120 AD2d 824, 826.) This he failed to do. Aside from the initial $50,000 payment in acquiring the Grove Street property and two subsequent payments of mortgage principal, there is no evidence whatsoever of its maintenance or renovation being funded by the husband's separate property.

Furthermore, the wife has been the homemaker and the primary caretaker of the parties' child. It is she who has taken the responsibility for the child's day-to-day nurturing. Her role as mother is in addition to the help and assistance she rendered to the husband in giving business advice, entertaining business associates and assisting him in his career. It is clear that her own business activities, which resulted in substantial losses, were entirely secondary to her primary role as mother and homemaker. In *Robinson v Robinson* (166 AD2d 428, *lv dismissed,* 76 NY2d 1017), the court sustained an award to the wife for the appreciation in value of the marital residence, a condominium purchased by the husband several years before the 4½-year marriage, finding, *inter alia,* that she "made significant and vital contributions as a homemaker, spouse and as the primary caretaker of the parties' infant children" *(supra,* at 430). In *Derderian v Derderian* (167 AD2d 158 *appeal denied* 77 NY2d 804), this court sustained a distributive award to the wife with respect to the appreciation of the husband's real estate enterprises, found to be his separate property, based on "her services as a homemaker" and "in maintaining and operating the real estate." *(Supra,* at

158.) Indeed, the Equitable Distribution Law was enacted precisely to give increased recognition to noneconomic contributions. Equitable distribution is "based on the premise that a marriage is, among other things, an economic partnership," the success of which "depends 'not only upon the respective financial contributions of the partners, but also on a wide range of nonremunerated services to the joint enterprise, such as homemaking, raising children and providing the emotional and moral support · necessary to sustain the other spouse in coping with the vicissitudes of life outside the home' ". *(Price v Price, supra,* 69 NY2d, at 14.)

The IAS court also erred in its assumption that all the funds invested in the Grove Street property, either for renovation, repairs, mortgage payments or maintenance, were the husband's separate property. As already indicated, no evidence was introduced to show that the husband had separate assets that could have been so used. To the extent that the funds used to finance, improve or maintain the property came from wages or income earned during the marriage, these funds are marital property and the wife is entitled to an equitable share thereof. *(See, Rider v Rider,* 141 AD2d 1004.) Thus, in addition to overlooking the wife's nonfinancial contributions, the trial court as well ignored the marital nature of the funds contributed to the Grove Street property. It is, as the court noted in *Lord v Lord* (124 AD2d 930), "apparent that the property's augmented value * * * was, in part, the result of labors and moneys expended while the marital partnership existed".

In that regard, the trial court held that the wife was required to establish, by a precise dollar amount, the increase in value of the Grove Street property attributable to the renovation. There is no requirement that the nontitled spouse prove precisely how the active efforts of either party quantitatively contributed to the property's appreciation. Indeed, any such requirement would run counter to the statutory concept of marriage as an economic partnership. All the nontitled spouse need show is that the appreciation was due in part to his or her marital efforts or contribution.

Since the wife is entitled to share in the postmarriage appreciation of the Grove Street property, as marital property, to, in this case, the time of the "execution of [the] separation agreement" (Domestic Relations Law § 236 [B] [1] [c]), the matter must be remanded to the trial court for a resolution of that issue. The only evidence on that point is the 1979

purchase price of $435,000 and the $1,800,000 valuation as of August 15, 1988. Unfortunately, the record does not disclose the value of the Grove Street property on April 19, 1984, when the separation agreement was executed.

■ In that regard, we reject the wife's argument that the trial court improperly used the 1984 agreement as the cutoff date for the determination of marital property and as a predicate for a conversion divorce since it does not qualify as a separation agreement because it is incomplete and represents, at best, a partial settlement of the marital issues. (Cf., Sagan v Sagan, 53 NY2d 635.) Domestic Relations Law § 170 (6) requires a written agreement solely as evidence of the parties' agreement to live separate and apart. (Christian v Christian, 42 NY2d 63, 70.) It is undisputed that the parties agreed to live separately. The agreement explicitly provided for joint custody, child support, spousal maintenance and the right to live separate and apart. In fact, the agreement only documented what had occurred in December 1982—the parties were living apart; the marriage had broken down. Thus, the agreement qualifies as an "agreement of separation" and complies with the statutory requirement for a divorce under section 170 (6). The husband's return to the Grove Street residence for one week in August 1984 in an unsuccessful attempt at a reconciliation does not, as argued, effectuate a cancellation of the agreement. As in Rosenhaus v Rosenhaus (121 AD2d 707, 708, lv dismissed 68 NY2d 997), this failed effort was not a resumption of the marriage sufficient to demonstrate an abandonment of the agreement.

Since 1984, both parties have accepted performance under the agreement as a complete discharge of their marital obligations. The statute requires only that the agreement be "substantially performed"; literal compliance is not required. There is no contention that the husband ever failed to fulfill his obligation to support the wife and child. At most, it is argued that he failed to provide full reimbursement of $8,000, a relatively insignificant amount, in undocumented medical expenses. There was no proof that the wife paid such bills or that she passed them on to the husband. Thus, the trial court properly used the separation agreement in its delineation of marital property and as the basis for awarding the husband a judgment of divorce.

■ The husband claims that the court erred in awarding the wife exclusive occupancy of the Grove Street marital residence, for two years, while the wife argues that the court

improperly limited her contractual right to exclusive occupancy of the premises. Pursuant to Domestic Relations Law § 236 (B) (5) (b), "[s]eparate property shall remain [separate]". Thus, there is no authority to deprive a party of title to or possession of property he or she acquired prior to the marriage. *(Vitkun v Vitkun,* 108 Misc 2d 814.) This principle was well settled prior to the advent of the Equitable Distribution Law. *(See, e.g., Weltz v Weltz,* 35 AD2d 208.)* "There is no authority for depriving the husband of his right to occupy or otherwise dispose of his own property." *(Supra,* at 209.) While the Equitable Distribution Law makes provision for the use and occupancy of the marital home "without regard to the form of ownership of such property" (Domestic Relations Law § 236 [B] [5] [f]), any order so providing must necessarily be limited to the extent that it "will not deprive a person of his title to or possession of property he or she acquired prior to the marriage." *(Vitkun v Vitkun, supra,* at 816.)

Having found that the Grove Street house was the husband's separate property, the trial court was faced with the difficulty of reconciling that finding, and the concommitant obligation of ensuring that the property retained its character as separate property, with the terms of the separation agreement, which provided for the wife and child to live indefinitely at the former marital residence. The court, of necessity, had to modify the separation agreement, as even the parties explicitly recognized it had a right to do, when they acknowledged that the agreement did not "affect the rights of either party on the issue of equitable distribution," to limit the wife's and child's use and occupancy of the marital residence at Grove Street. It did so by ordering the wife and child to vacate the marital premises in two years, limiting the husband's contribution to the increased cost of shelter to $3,500 per month until the child reaches 21 or is sooner emancipated.

The court, however, in our view, imposed an undue burden on the wife by obligating her to pay one half of the rent or carrying charges on any apartment or house that she occupies with the child. The separation agreement required the husband alone to pay all such charges at the Grove Street house, which are estimated at about $10,000 per month, while the child lived with the wife. Thus, the judgment should be modified to provide the husband with the choice of either allowing the wife and child to live in the Grove Street house as provided in the separation agreement, with the husband continuing to pay the related expenses, until the child reaches

21 or is sooner emancipated, or providing the wife and child with comparable living arrangements agreeable to both parties. In that connection, we note that the court tied the termination of exclusive occupancy to the payment of the wife's distributive award. In his testimony, the husband conceded that he had at least $400,000 in hand and was to receive an additional $1 million from Bidermann. Thus, the sale of the Grove Street property was not required to enable the husband to pay the distributive award.

■ The wife also argues that the court abrogated the parties' separation agreement by rewriting its support provision, which called for the payment of both child and spousal support in the unallocated sum of $5,000 monthly. The trial court, finding that the wife established "a business of children's haircutting and clothing" and "is capable of maintaining herself in the future", allocated $2,500 of the $5,000 monthly payment to maintenance, and the other $2,500 to child support and limited the wife's maintenance to four years. The only durational limit that may be inferred from the agreement is that the $5,000 payment was intended, in part, for the welfare of a minor child. Thus, the child support provision could properly be limited to the child's reaching the age of 21 or sooner becoming emancipated. The trial court's allocation was therefore necessary and fair and in accord with Domestic Relations Law § 236 (B) (7).

■ There was, however, no such durational limitation with respect to the wife's maintenance. Such a limitation should not be imposed where the needy spouse is unlikely to be completely self-supporting. (See, Malamut v Malamut, 133 AD2d 101.) After having, before marriage, changed her employment due to her relationship with the husband and, after marriage, assumed the role of homemaker and primary caretaker of the parties' child, the wife cannot be expected to become fully self-supporting. As even the husband candidly conceded at trial, it was unlikely that her business would ever generate sufficient income to repay its debts. It is much less likely to provide a sufficient basis for support. By the terms of the judgment, support for the wife will be terminated, not at a point in time when she is likely to be self-supporting, but at a time when she will be more in need of it than ever. In four years, she will be over 50 years of age and her employment opportunities will be declining, not improving. Moreover, the four-year period is purely arbitrary. There is nothing in the record to indicate that her earning capacity will be any better

then than now. A time limitation on maintenance should be imposed only to enable a dependent spouse to obtain training to become financially independent *(see, Raviv v Raviv,* 153 AD2d 932, 934) or to allow such spouse to restore his or her earning power to a previous level *(see, Pulitzer v Pulitzer,* 134 AD2d 84, 88).

Moreover, it has been held, "Generally, separation agreements which are regular on their face are binding on the parties, unless and until they are put aside". *(Christian v Christian, supra,* 42 NY2d, at 71.) Since the parties should be encouraged to settle their own differences, judicial review is necessarily limited and should be sparingly exercised. *(See, supra,* at 71-72.) Here, there is no claim or evidence of over-reaching by the wife. Nor is the agreement in respect of maintenance unfair in light of the husband's financial worth and ability to earn a living. In such circumstances, the trial court should not have limited the wife's maintenance to four years. At most, any limitation should have been until the wife dies or remarries, a limitation which, from the circumstances, can reasonably be inferred. In light of this determination, we reject, out of hand, the husband's argument that the wife is not entitled to any further maintenance. Not only does the husband, in advancing such a claim, ignore the record, he forgets that at the trial he prevented the wife from offering any evidence as to her living expenses on the ground that the amount of support had been fixed by the 1984 agreement.

■ The wife also argues that the court improperly limited her equitable share of the proceeds of the husband's sale of his 10% stock interest in Bidermann, S.A., which the court treated as marital property, purporting to value it as of the commencement of the action, i.e., April 2, 1986. Actually, the court used the September 18, 1987 sales price to value the stock. In any event, the stock, which the husband conceded was marital property, is a passive asset because its increase in value was "a result of random market fluctuations or the efforts of others". *(Greenwald v Greenwald,* 164 AD2d 706, 716.) There is no evidence in this record that the husband's work with Bidermann U.S.A. directly increased the value of the international Bidermann, S.A., stock. On the contrary, as the husband himself argues, the prospect of a $120 million cash infusion brought about by a license repurchase by Ralph Lauren created an enormous leap in the stock's value in mid-1987. Thus, irrespective of the accuracy of the husband's claim of this sudden increase in value, since the asset is clearly

passive, there is no merit to his argument that the stock should be valued as of April 2, 1986. "Passive assets should generally be valued as of the trial date so as to prevent a windfall to the titled spouse if the asset has increased in value". *(Supra,* at 716.)

The wife's claim that the Bidermann, S.A., stock proceeds were improperly distributed is based on her argument that the husband sold his stock as "a single installment sale" for $8 million, not $4,570,000, submitting as proof the parties' 1987 joint tax return and other documents which confirm this price. The husband argues that the stock was sold for $4,570,000 and the tax-reported $8 million represents the sale price plus an additional $3.5 million from an independent "severance and employment" contract with Bidermann. He testified that the transaction was structured in this fashion to obtain the most favorable tax treatment.

■ Accepting this testimony, the trial court found that the $3.5 million was not part of the sale and accordingly valued the stock at $4.5 million, presumably intending to value it at $4,570,000, the actual sale price. All things considered, the court's determination is supported by the record, except for the $70,000 that it inexplicably omitted from the valuation. The husband testified that the correct value of the stock was $4,570,000 at the time it was sold and the trial court's valuation should be modified accordingly.

■ The wife argues in the alternative that even if the $3.5 million was not part of the purchase price of the stock, the funds are still marital property because they were paid in exchange for rights acquired during the marriage. This case, however, is distinguishable from *Marcus v Marcus* (135 AD2d 216), upon which she relies. There, the husband liquidated funds from a limited partnership acquired during the marriage and then used those funds to purchase property after the commencement of the action. The court held that the after-acquired asset was marital property because the funds used to purchase it were marital property. In the present case, the husband terminated his employment with Bidermann and entered into a settlement agreement with respect thereto after the commencement of the action. The husband's rights to these funds were acquired at that time and thus the funds are not marital property. The wife has no more right to an equitable distribution of those funds than she would have to a future raise in the husband's salary if he remained working. In this regard, we take into account that the parties were

married for only three years before they separated, while the husband worked 14 years in all for Bidermann.

■ The husband also submitted evidence that the value of the Bidermann stock was $1 million at the time he received it pursuant to his settlement agreement and that taxes were paid on that value, albeit not by him. Therefore, the trial court correctly used $1 million as the cost basis for computing the approximate capital gains tax, which the court then subtracted from the $4,500,000 valuation of the stock. The wife argues, however, that the court should have factored in the husband's farm, tax shelter, and business losses (totaling $1,044,278) in computing the capital gains tax, since he used these losses to offset the capital gains on the sale of the stock on the parties' tax return. According to our calculations, the net value of the stock, after taxes, using the correct $4,570,000 sales price, should be $3,862,798, which takes into account the $1 million cost basis, the $1,044,278 in offsetting losses, and a 28% tax rate (capital gains tax = $707,202).

The remaining issue on this point involves a determination as to the wife's equitable share of the $3,862,798 stock proceeds. She argues that she is entitled to a 50% share. Equitable distribution, however, does not necessarily mean equal distribution. *(Greenwald v Greenwald, supra,* 164 AD2d, at 713.) Marital property should be "distributed equitably between the parties, considering the circumstances of the case and of the respective parties." (Domestic Relations Law § 236 [B] [5] [c].) The statute lists 13 factors to be considered. (§ 236 [B] [5] [d].)

■ Although the husband conceded that the stock is marital property, he also testified that Bidermann, in 1973, six years before the parties were married, promised to give him the stock. This is a circumstance that should be considered in determining the wife's equitable share. The duration of the marriage must also be considered. Although the parties were married for seven years, they were separated for four of those years, entering into a separation agreement after five years of marriage. Furthermore, the husband received the stock in 1982, after only three years of marriage and shortly before their separation. On the other hand, throughout those three years, the wife acted as homemaker and, thereafter, took care of the parties' child. The trial court, after considering all of these factors, determined that the wife's equitable share of the stock should be 25%. Under the circumstances, we see no

reason to change this determination and award her $965,700, i.e., 25% of the adjusted net value of the stock.

■ The wife also argues that she is entitled to an interest in the Esopus farm, which the husband purchased before the marriage. The court limited its award to her in that regard to $220,350, i.e., 50% of the value of the "Twin Brook Farm", an adjoining property which the husband purchased after the marriage. In its second decision, the court also awarded the wife 50% of the increase in value of the Esopus farm, i.e., $591,500, as a result of the addition of the horse barn during the marriage. The Esopus farm is nonmarital property since the husband purchased it before the marriage and he purchased the additional land acquisitions, except for the "Twin Brook Farm", after the execution of the separation agreement. The husband also reorganized the land acquisitions during the marriage through additional deeds, but this property remained separate property.

All things considered, the court appropriately awarded the wife a total of $811,850 as her equitable share of the "Twin Brook Farm" and the increased value of the Esopus farm. There is no merit to the wife's argument that she is entitled to a share of the Esopus farm, the husband's separate property, other than what she was already awarded.

■ The husband argues that the wife must share in his losses if she wants to share in his gains, and thus the court erred in not awarding the wife 50% of his tax shelter investments. We agree with the husband and reverse the court's decision that the tax shelter liabilities were the husband's alone. In this regard, we take into account that the wife herself used these tax shelters to increase her award from the sale of the Bidermann stock. Moreover, "since the tax savings realized from these shelters inured to the parties' mutual and equal benefit, so too should any disallowances inure to their mutual and equal detriment." (Capasso v Capasso, 129 AD2d 267, 290.) Since the parties acquired the seven tax shelter investments during the term of the marriage, they are marital property and should be distributed equitably. The parties must also equally share the liabilities of the tax shelter investments. Furthermore, since the husband denied the wife access to the relevant tax shelter papers, there is no merit to his argument that her appraisal of those shelters was fraudulent.

■ Finally, we note that in the amended decision the court

provided that the wife's distributive award be paid within 90 days from the date of judgment. In its judgment, however, the husband was directed to pay one half of the award upon receipt of the settlement moneys from Bidermann and the other one half "on or before [the wife's] vacating of 36 Grove Street". The original directive was reasonable and proper and we modify to provide accordingly.

We have examined the other issues and find that they are without merit.

Accordingly, the judgment of the Supreme Court, New York County (Walter M. Schackman, J.), entered on or about April 13, 1990, should be modified, on the law and on the facts, and in the exercise of discretion, to award the wife a one-half distributive share of the postmarriage appreciation of the Grove Street property until April 19, 1984 and to remand the matter for a determination of the value of said share; to order the husband either to permit the wife and child to live in the Grove Street house until the child reaches 21 or is sooner emancipated and to continue to pay the related expenses as provided in the separation agreement or to provide the wife and child with comparable living arrangements agreeable to both parties; to direct the payment of monthly maintenance in the sum of $2,500 to the wife until she remarries or dies; to award the wife $965,700 as her distributive share of the proceeds from the sale of the Bidermann, S.A., stock; to direct that the parties share equally in the tax shelter liabilities and that the husband pay the entire distributive award, less the amount, to be determined, due with respect to the Grove Street property, within 90 days of entry of this order, and, except as thus modified, affirmed, without costs or disbursements.

CARRO, ELLERIN, ROSS and ASCH, JJ., concur.

Judgment, Supreme Court, New York County, entered on or about April 13, 1990, unanimously modified, on the law and on the facts, and in the exercise of discretion, to award the wife a one-half distributive share of the postmarriage appreciation of the Grove Street property until April 19, 1984 and to remand the matter for a determination of the value of said share; to order the husband either to permit the wife and child to live in the Grove Street house until the child reaches 21 or is sooner emancipated and to continue to pay the related expenses as provided in the separation agreement or to provide the wife and child with comparable living arrangements

agreeable to both parties; to direct the payment of monthly maintenance in the sum of $2,500 to the wife until she remarries or dies; to award the wife $965,700 as her distributive share of the proceeds from the sale of the Bidermann, S.A., stock; to direct that the parties share equally in the tax shelter liabilities and that the husband pay the entire distributive award, less the amount, to be determined, due with respect to the Grove Street property, within 90 days of entry of this order, and, except as thus modified, affirmed, without costs or disbursements.