Barbara Harmon, Respondent, v Stephen Harmon, Appellant.

First Department, January 7, 1992

## APPEARANCES OF COUNSEL

*John E. Halpin (Elizabeth M. Barnett, Brian Burns* and *Neil E. Sherman* with him on the brief), for respondent.

*Jerome Tarnoff* of counsel *(Theodore S. Steingut* and *Ann R. Starer* with him on the brief; *Berger Steingut Tarnoff & Stern,* attorneys), for appellant.

## OPINION OF THE COURT

SULLIVAN, J. P.

Married on June 19, 1966, when he was a third-year law student on scholarship and she, a speech and hearing therapist, was the sole support of the family, the parties came to a parting of the ways, leading to the June 19, 1984 commencement of this action for divorce. There are two children of the marriage, a daughter, born September 19, 1968 and now emancipated, and a son, born August 11, 1971, who, at age two, was diagnosed as "withdrawn" with "autistic features".

The wife is a highly educated, experienced and credentialed speech and hearing pathologist and educational administrator who, throughout the marriage, except for a short period of time when the children were extremely young, was employed, at least part time. She also holds a real estate salesperson's license and worked as a commissioned broker in the New York City commercial real estate market from mid-1981 through December of 1986. Her income in the years 1986 to 1990 was between $40,000 and $45,000 annually. She earned more than $52,000 in 1989. Although the wife had been the director of the Eden School in Staten Island and was capable of earning at least $65,000 per year, she thereafter decided to forego such employment in order to oversee the son's educational progress and coordinate the efforts to have him admitted to an appropriate postsecondary school.

After the husband's 1967 graduation from law school, he clerked in the New York Court of Appeals for two years before joining a prestigious New York City law firm, in which he has been a partner since 1977. His duties consist primarily of servicing the firm's clients and supervising younger associates in the litigation department. The husband earned $130,000 in 1984, $220,000 in 1989 and $127,324 in the fiscal year immediately preceding the commencement of this action. As a partner in the firm, he enjoys other perquisites.

After their marriage and with the help of gifts from their

respective families, the parties bought a house in Baldwin, Long Island, where they lived until August 1978 when they moved to Manhattan better to provide for the son's special educational needs. They sold the Baldwin house and bought a cooperative apartment at 270 West End Avenue, enrolling their daughter at the Dalton School and obtaining full State funding for the son at The Gateway School, which was equipped to provide for his special needs. After the son's graduation from Gateway, the State of New York also fully funded his education at The Churchill School in New York and subsequently at the Community School in New Jersey, at both its Englewood Cliffs and Teaneck facilities. After two years, however, he was accepted into the Community School's high school program. His participation in this program, which was located at another site in New Jersey, would have entailed a 1½-hour bus commute, each way, originating and terminating at the Port Authority Bus Terminal in Manhattan. Concerned that such a lengthy commute would be harmful to the son since one of his autistic features, i.e., talking to himself, would be aggravated by such a long trip, the wife, instead, enrolled him in the Winston Preparatory School in New York, which would not accept State funding. The husband refused to contribute to the cost of the Winston School and the wife alone bore the burden of the $46,750 tuition. The son graduated from the Winston School in June 1990 and is now attending college in Florida.

The husband's post-separation relationship with the children, as demonstrated by the record and found by the trial court, has been positive and consistent. Before the son left for college, he spent several nights each week with his father. They frequently attended sports events together and met for lunch. The husband paid the daughter's college tuition and has diligently complied with the IAS court's pendente lite orders awarding the wife $200 weekly in maintenance and the children $200 per week in support. At the time of these awards, the wife did not have an income and the husband was earning approximately $130,000 annually.

The wife, in June 1985, after the commencement of this action, left the marital home with the two children, subletting for the first several months and then leasing an apartment off Central Park West. Pursuant to the parties' agreement, the cooperative apartment, their second since moving from Baldwin, was sold in December 1985 for $517,500, from which each received approximately $225,000. Thus, by the time the case

proceeded to trial in September 1989, the bulk of the parties' marital assets, i.e., the proceeds from the sale of their cooperative apartment, had already been divided equally between them. The only asset remaining for equitable distribution was the husband's partnership interest in the law firm; the distribution of certain outstanding marital debts was also at issue.

At trial, the husband withdrew his answer and counterclaim and the wife was granted a divorce on the ground of abandonment. Judgment was withheld pending resolution of the financial issues, which, in addition to equitable distribution, included maintenance and child support. After hearing testimony over five days and taking posttrial submissions, the court awarded the wife lifetime maintenance of $400 per week retroactive to January 1986, terminable upon remarriage or death. The court also directed that the husband maintain a $100,000 life insurance policy or alternative death benefit for the wife for as long as he is required to provide maintenance.

The court applied Domestic Relations Law § 240 (1-b), the Child Support Standards Act (CSSA), which took effect during trial, in calculating support for the son for the period beginning with the effective date of the statute. Finding that the wife was the primary caretaker of the children after the separation and that the daughter had been fully emancipated since September 1989, the court compared the respective earnings of the parties and granted retroactive child support for the daughter to the time she left home for college, after which she was supported by the husband. Retroactive support, which was to continue through his college years, was also awarded with respect to the son. The husband was also directed to pay 100% of the son's uninsured medical costs as well as 75% of his tuition and college costs; the wife was to pay 25% of the tuition and related costs. In addition, the court ordered reimbursement to her of the cost of the son's high school education.

After considering the expert testimony and reviewing various provisions of the husband's partnership agreement, the court found the value of the husband's partnership interest to be the sum of his capital account ($84,693) plus 175% of his average earnings for three years, for a total of $292,870. After determining that two notes totaling $33,800 relating to tax shelter investments were a marital liability, and crediting the husband accordingly, the court found the marriage to have been a true economic partnership and divided the assets and

liabilities on a 50-50 basis. The wife was awarded $129,535 as her distributive share.

On appeal, the husband, *inter alia,* argues that his only realizable interest in the law firm as of the commencement of this action was his capital account and that the court should have credited all of his debts as marital before making a distributive award. He also challenges the award of lifetime maintenance and the application of CSSA to this matter as well as the award of retroactive maintenance and child support, which he claims is punitive. He argues that it was error to require him to reimburse the wife for the son's private high school tuition, which he claims was unnecessary. Finally, the husband contends that the court should have allowed him a reasonable period of time to pay any distributive award.

Section 11 (b) of the husband's partnership agreement, labeled "Return of Capital", provides for various terms of payment to a partner of his capital account depending on whether he or she retires, becomes disabled or withdraws. While other provisions provide for retirement and disability income, this provision, whatever the reason for leaving, provides for no payment other than from the capital account. Section 18 (c) states that a withdrawing partner has no interest in "work in process, uncollected accounts, good will or any other matter or cause." Since, on the basis of these two clauses, no provision is made to compensate a withdrawing partner for receivables, unbilled time, furniture, fixtures, equipment or good will, the husband argues that the interest of a withdrawing partner is limited to the only other asset of the firm, i.e., the capital account.

Section 18 of the agreement, covering voluntary and involuntary withdrawal from the firm, provides that any partner who withdraws and engages in private practice shall be liable to the firm for an amount equal to 12½% of the firm's profits allocable to him or her for the two fiscal years prior to withdrawal, unless the amount allocable to the partner was less than $85,000 and said partner does not render services to clients of the firm for the two-year period after withdrawal. A partner terminated without cause is entitled to six months' salary and is not subject to the 12½% penalty; there is no provision for the return of the capital account in those circumstances.

At trial, both sides, through their respective experts, presented evidence of the husband's interest in the law firm. The

wife's expert considered three methods of evaluation: one based on the partnership agreement; another based on a multiple of gross revenues and a third, characterized as the formula approach, based on the husband's good will and profit interest in the firm, less the average salary paid to attorneys who engage in work similar to his. Since he lacked the requisite financial data to consider the other two, the wife's expert selected the partnership agreement method as the most reliable.

In doing so, the wife's expert utilized section 12 (a) and (d), the death benefit provision of the partnership agreement, which provides for the payment of an amount equal to the deceased partner's capital account plus an amount equal to his or her average salary for the three years immediately preceding death multiplied by 175%. According to the expert, the latter represented the deceased partner's net share of work in process, uncollected accounts, assets and, presumably, good will. Applying this formula and using 1982, 1983 and 1984 salary figures, the wife's expert valued the husband's interest in the firm at $308,000 as of 1984.

■ The husband's expert agreed that the partnership agreement should be used to value the husband's interest in the law firm. He averaged the husband's salary for three years, 1981, 1982 and 1983, and multiplied that amount by 175%, adding in the amount in the capital account but deducting taxes that would have to be paid by the estate on that portion attributable to the husband's income. Accordingly, the husband's expert valued the husband's partnership interest at $255,800. The trial court rejected, properly so, in our view, the argument that taxes should be deducted from the death benefit valuation inasmuch as income was being used for valuation and not distribution purposes and no taxable event, i.e., death, had occurred. In the absence of a showing that a taxable event is involved, a court is not required to consider tax consequences. (*In re Marriage of Fonstein*, 17 Cal 3d 738, 131 Cal Rptr 873; *Weaver v Weaver*, 72 NC App 409, 324 SE2d 915.)

The husband's expert also considered section 18 (a), the withdrawal provision of the partnership agreement, to value the husband's interest in the firm. Using this approach, he valued it at $87,813, the amount of the husband's capital account at the time of the commencement of the action. In making his calculation, however, the husband's expert did not reduce the value of his interest by the 12½% penalty for

voluntary withdrawal or termination for cause. Rather, he assumed the husband would "practice[ ] law in such manner as not to have been subject to the penalty." The husband's expert had no opinion as to which of the two methods should be used.

The court adopted the modified death benefits valuation method suggested by the wife's expert, finding the value of the husband's interest in the law firm as of June 19, 1984 to be the sum of his capital account at the time ($84,693) plus 175% of his average earnings for the immediate three years prior thereto ($208,177), for a total award of $292,870. It should be noted that the only difference between this amount and the figure realized by the husband's expert, using the death benefit approach, was the deduction for taxes.

Contrary to the husband's argument, the court did not, *sua sponte,* construct its own method of valuation but examined the partnership agreement and carefully considered the testimony of the experts. In fact, in using the partnership agreement's death benefit provision, the court adopted a method proposed by both experts. Utilization of a death benefit provision in a partnership agreement is an acceptable method of valuation. *(See, Stolowitz v Stolowitz,* 106 Misc 2d 853, 858; *Stern v Stern,* 66 NJ 340, 346, 331 A2d 257, 260.) *Stern* involved a law partnership agreement, almost identical to the one herein, which provided that the estate of a deceased partner was "to receive the then value of his capital account, readily determinable from partnership books, together with a fixed sum appearing after the partner's name on a schedule appended to the partnership agreement" (66 NJ, *supra,* at 346, 331 A2d, *supra,* at 260), which, the court found, was "obviously intended to reflect those elements of partnership worth other than the member's capital account." (66 NJ, *supra,* at 346, 331 A2d, *supra,* at 260.) The proceeds of an insurance policy would fund the payments under the death benefit provision.

The husband argues that the death benefit valuation is a fiction because he is not entitled to receive it. By parity of reasoning, utilization of the withdrawal provision advocated by his expert would be similarly inapplicable since the husband has not withdrawn from the firm or been terminated. More to the point though, the withdrawal provision is not an appropriate method of valuation since a withdrawing partner foregoes any interest in work in progress, uncollected accounts and good will, while a nonwithdrawing partner retains such interest, which the death benefit provision values at 175% of

the average of three years' salary. The valuation of a marital asset, particularly an intangible asset such as an interest in a professional partnership, must be founded in economic reality. Thus, acceptance of the death benefit valuation was appropriate in the circumstances.

■ Even if, as the husband contends, the court, *sua sponte,* fashioned its own formula for valuation outside the partnership agreement, the result reached is justified nonetheless since, like a shareholders' agreement fixing the value of the stock in the event of a buyout, it is based on an agreement by the partners as to the value of their respective interests in the firm. *(See, Stempler v Stempler,* 143 AD2d 410.) Absent some evidence that the valuation is unreasonable or other credible evidence showing a different value, it should not be disturbed. *(Rosenberg v Rosenberg,* 126 AD2d 537, *lv denied,* 70 NY2d 601.)

In contending that his interest in the firm is limited to the amount in the partnership account, the husband cites *Rosenberg v Rosenberg* (145 AD2d 916, *mod* 149 AD2d 985). There, unlike here, however, the partnership agreement specifically defined the interest of the partner as the amount in the capital account. *(See also, Dignan v Dignan,* 156 AD2d 995.)

■ The husband argues that the court failed to credit him with more than $71,000 of identified marital debt. As noted, he was credited only with the payment of principal on two tax shelter investments, totaling $33,800. He contends that the court should have taken into account $24,136 for potential future tax liability attributable to one of the tax shelters, $40,000 in two personal bank loans and $7,104 in miscellaneous expenses and credit card charges. The only evidence of any potential tax liability was the first page of a K-1, unsigned, submitted to the trial court 11 months after the conclusion of the trial and a letter from the tax shelter, Capgro Leasing Associates, also unsigned, dated approximately two weeks subsequent to the date of the trial court's decision. Considering the lack of probative worth of the one self-serving, posttrial submission which was before it, the court rightfully rejected the husband's potential tax liability claim as too speculative. *(See, Greenwald v Greenwald,* 164 AD2d 706, 719-720, *lv denied,* 78 NY2d 855.) As for the two bank loans, one in the amount of $15,000 and the other for $25,000, the husband testified that he took out the $25,000 loan in April 1984, two months prior to the commencement of this action, for living expenses and tax obligations. Of course,

since the husband filed a separate tax return for 1984, any 1984 tax obligations were his alone. In any event, the husband is unable to offer any documentary support for these claims, either as to the existence of the loans, their purpose or the source of repayment. The trial court rightfully rejected them.

With respect to the $7,104 claim for miscellaneous expenses and credit card charges, the husband submitted a list itemizing these expenses but conceded that $2,581.50 was incurred in his photography business. Notably, he failed to present any evidence as to when the other expenses were incurred, the purpose thereof, whether they were paid and, if so, the source of the funds. He merely claims, five years after the commencement of the action, that certain expenses remain outstanding. The trial court properly rejected these expenses as a marital debt.

■ The husband's claim of error with respect to the award of lifetime maintenance is well taken. As the record discloses, the wife, a healthy, highly educated and experienced professional, is capable of earning $75,000 per year. Domestic Relations Law § 236 (B) (6) (a) provides for an award of maintenance in "such amount as justice requires, having regard for the standard of living of the parties established during the marriage, whether the party in whose favor maintenance is granted lacks sufficient property and income to provide for his or her reasonable needs and whether the other party has sufficient property or income to provide for the reasonable needs of the other and the circumstances of the case and of the respective parties." Thus, the award may be for a definite or indefinite period of time *(see, Sperling v Sperling,* 165 AD2d 338), depending on the needs of the party in whose favor the award is made.

Here, although the wife sought maintenance for only one year, the court awarded her lifetime maintenance retroactive to January 1, 1986, finding that she could not approach the husband's current and anticipated earnings. Lifetime maintenance is appropriate only where a spouse is incapable of future self-support or has clearly subordinated a career to act as homemaker and parent *(see, Zelnik v Zelnik,* 169 AD2d 317; *Brownstein v Brownstein,* 167 AD2d 127, *lv denied* 77 NY2d 806), has no obvious skills or training *(see, Iacobucci v Iacobucci,* 140 AD2d 412) or is mentally or physically ill *(see, Goldfarb v Goldfarb,* 173 AD2d 355). An award of rehabilitative maintenance, on the other hand, is intended to allow a spouse the " 'opportunity to achieve [economic]

independence' " (Sperling v Sperling, 165 AD2d, supra, at 343, quoting O'Brien v O'Brien, 66 NY2d 576, 585). Given the wife's earning capacity and the fact that the children are either emancipated or in college, we believe that a maintenance award of $400 per week for one year from the date of judgment, retroactive to January 1986, is sufficient to give her " 'a reasonable period of time * * * to * * * update [her] work skills and to enter the employment market with a view to becoming self-supporting' ". (Supra, at 343, quoting Neumark v Neumark, 120 AD2d 502, 504.) The $100,000 life insurance policy or alternative death benefit should be maintained for a similar period of time.

■ Contrary to the husband's arguments, the trial court's award of retroactive maintenance and child support are not punitive and arbitrary. The retroactive feature reflected the court's response to the inadequacy of the pendente lite awards —$200 per week in child support and $200 weekly in maintenance from August 1984—which created a financial hardship for the wife. The record discloses that the wife was compelled to expend some of the proceeds from the sale of the marital residence to provide for her and her children's daily needs and to pay the son's tuition as well as counsel fees. By the time of the court's decision in 1991, when the husband was earning $200,000 per year, these amounts were clearly insufficient. While the husband argues that retroactivity should not have been considered because, quoting from Horn v Horn (76 AD2d 826, 827), "a speedy trial is the surest way of correcting any inequities made in an award or denial of temporary alimony" and the wife, who changed attorneys four times, was to blame for the delay in bringing this case to trial, the inescapable fact is that the husband did not answer the complaint for four years.

■ The husband contends that the trial court erred in applying the CSSA in fashioning its child support award since the statute did not take effect until after trial commenced, and neither party had notice that its provisions would be applied. In addition the husband argues that the record shows that he shared custody, both legal and physical, of the son and the CSSA does not apply to a joint custodial arrangement. This court has held that since the CSSA "represents important public policy it should be applied to matters which commenced prior to the effective date of the act but which have not yet been finally decided". (Gelb v Brown, 163 AD2d 189, 191.) As to the husband's argument that the CSSA does

not apply to a joint custodial arrangement, the court found that the wife was the primary caretaker and de facto custodian of the children, a finding which we see no reason to disturb.

Utilizing the CSSA for the period September 15, 1989 through the date of the son's September 4, 1990 entry into college, the court directed the husband to pay $582 per week for his support, in addition to his medical insurance and unreimbursed counseling and medical expenses. From September 4, 1990 through his 21st birthday, the court awarded the wife $437 per week for the son, in addition to 75% of his college costs as well as his medical insurance and unreimbursed medical and counseling expenses. In arriving at these figures, the trial court applied the 17% "child support percentage" contained in Domestic Relations Law § 240 (1-b) (b) (3) (i) to that portion of the parties' income over, as well as under, the $80,000 statutory threshold, resulting in a basic child support obligation of over $35,000 per year. The husband argues that, even if the CSSA were applicable, the award, many times greater than the pendente lite award, without taking into account the substantial additional expenses for tuition and the like, is, in any event, patently excessive for a 20-year-old child living away at college for most of the year.

Even though the CSSA is applicable to this proceeding, as the husband correctly argues, had he had notice that the statute was going to be applied he would have litigated that aspect of the case differently. The CSSA mandates strict application of the statutory formula to the combined parental income under $80,000 to determine the child support obligation and the noncustodial parent's pro rata share thereof unless the court finds that the noncustodial parent's pro rata share is "unjust or inappropriate", based on a consideration of specifically enumerated factors. (Domestic Relations Law § 240 [1-b] [f].) Where, however, the combined parental income exceeds $80,000, there is greater discretion allowed to the court. In such cases, the court may determine the amount of child support with respect to the amount of income in excess of $80,000 either through consideration of the statutory factors set forth in Domestic Relations Law § 240 (1-b) (f) and/or the child support percentage. (See, Domestic Relations Law § 240 [1-b] [c] [3].) Thus, the court, under either the "standard of living the child would have enjoyed had the marriage or household not been dissolved" or the catch-all, "any other factors the court determines are relevant in each case" provi-

sion (Domestic Relations Law § 240 [1-b] [f] [3], [10]), is able to consider the child's "actual reasonable needs" in determining the amount of child support for the amount of the combined parental income in excess of $80,000.

Indeed, to apply blindly the statutory formula to the parties' aggregate income over $80,000 without any express findings or record evidence of the child's actual needs would constitute both an abdication of the judicial responsibility and a trespass upon the right of parents to make life-style choices for their children. Although entitled to support in accordance with the preseparation standard, a child is not a partner in the marital relationship, entitled to a "piece of the action". (Tippins, *The Child Support Standards Act: One Year Later*, NYLJ, Sept. 6, 1990, at 4, col 5; *see also, Reiss v Reiss*, 170 AD2d 589.) Accordingly, the matter should be remanded to take evidence on the appropriate amount of child support in accordance with the CSSA and to calculate the obligations of the parties in accordance therewith. The husband's obligation to pay the son's medical insurance, medical and counseling expenses and 75% of his college costs remains unaffected by our determination.

■ The husband's arguments with respect to the reimbursement of the son's high school tuition expenses fail since they largely ignore the record. Testimony, including that of an expert, was presented that the lengthy bus trip attendant upon the son's transfer to the Community School in Demarest would be harmful, given his autistic problems, and that it was in his best interest to attend a school closer to home. The wife was not, as the husband contends, obliged to seek relief, pendente lite, on this issue. She could, as she did, wait until the trial to seek the appropriate relief on a full record. Nor do we see any reason to interfere with the trial court's determination that the wife's decision to enroll the son in a school closer to home had a "more than reasonable basis" and its direction that the husband reimburse her for the tuition.

Finally, the husband argues that, given his current financial situation and inasmuch as he anticipated that any equitable distribution award with respect to his law partnership interest would be limited to his capital account, an amount far less than the award granted, he should have been given a reasonable payout period for any distributive award. We agree and provide for the payment of equal installments over a three-year period.

We have considered the husband's other claims and find that they are without merit.

Accordingly, the order of the Supreme Court, New York County (Phyllis Gangel-Jacob, J.), entered April 3, 1991, should be modified, on the law and on the facts and in the exercise of discretion, to limit the award of spousal maintenance to $400 per week for one year from the date of judgment, retroactive to January 1, 1986, to remand the matter for further proceedings in accordance herewith on the issue of child support and to provide for the payout of the distributive award in six equal payments over three years, the first of which shall be payable within 30 days from the date of the entry of the order herein, and, except as thus modified, affirmed, without costs or disbursements.

MILONAS, KUPFERMAN, ASCH and KASSAL, JJ., concur.

Order, Supreme Court, New York County, entered on April 3, 1991, is modified, on the law and on the facts and in the exercise of discretion, to limit the award of spousal maintenance to $400 per week for one year from the date of judgment, retroactive to January 1, 1986, to remand the matter for further proceedings in accordance with the opinion of this court on the issue of child support and to provide for the payout of the distributive award in six equal payments over three years, the first of which shall be payable within 30 days from the date of the entry of the order herein, and, except as thus modified, affirmed, without costs or disbursements.